UNITED STATES of America, Appellee,

v.

**Robert P. McCALL, Appellant.**

No. 83–5041.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1983.

Decided Aug. 17, 1984.

Kenneth E. Labowitz, Alexandria, Va. (Weight & Chamowitz, Alexandria, Va., on brief), for appellant.

Thomas M. Buchanan, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WIDENER, MURNAGHAN and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Robert P. McCall appeals from his conviction for armed robbery committed within the special maritime and territorial jurisdiction of the United States, 18 U.S.C. 2111. He was convicted on January 17, 1983, after a non-jury trial in the district court, and sentenced to a single prison term of five years.

McCall raises two principal challenges to the trial proceedings: that evidence used against him was obtained in violation of the fourth amendment by an invalid search warrant and that the affidavit of an unavailable witness was admitted as evidence

in violation of his sixth amendment right of confrontation and the Federal Rules of Evidence. Although we find no merit to McCall's fourth amendment claim, we reverse and remand for a new trial because the admission of the affidavit and supporting hearsay testimony was erroneous. For reasons set forth in the separate opinion of Judge Widener, in which Judge Murnaghan concurs, a majority of this panel holds that the affidavit was hearsay under Federal Rule of Evidence 802 and not admissible as an exception under Rule 803(24) or Rule 804(b)(5). The majority concludes that, under the doctrine of *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), it is not necessary to reach the sixth amendment question. I agree with my colleagues that the affidavit was inadmissible hearsay but differ from them in that I believe the sixth amendment question should be considered. Parts I and II of this opinion represent the unanimous views of the panel members, while Part III reflects my views only.

## I. FACTS

On July 6, 1980, Robert Neal, an officer of the Federal Protective Service (FPS), the police agency of the General Services Administration of the United States government, was robbed at gunpoint of eighty-nine dollars and his government-issue service revolver while on duty at the Pentagon. The robber fled, Neal telephoned for assistance, and Officer Jones, who was an FPS officer on roving motor patrol that evening, responded immediately to his call to the Pentagon Control Center. Neal, in reporting the robbery, described the suspect as a 5′ 10″ black man wearing black trousers, a black sport coat, and a trash bag over his head. Jones, undertaking an immediate search for the robber, ran into McCall, who was also an FPS officer on roving patrol. Jones and McCall then searched the Pentagon grounds looking generally in the area where the robber reportedly had escaped. Their search was unsuccessful.

About an hour and a half after the robbery, Criminal Investigator Leonard Hernandez, a detective with the FPS, interviewed Neal. In his sworn statement to Hernandez Neal stated, "Honest, I think I have seen that guy somewhere before. I don't know if it was an FPO or someone who works at the motor pool ... The guy who I think robbed me that I said I think works at the motor pool drives a Cadillac and is brown-skinned." Neal also stated that he thought he would recognize the assailant if he saw him again. Neal knew at the time of his statement that McCall was an FPS officer who drove a Camaro rather than a Cadillac. Later on the morning of the robbery, McCall helped Neal fill out an official report of the incident.

The government made little official progress toward apprehending the robber until sometime in the spring of 1982, over two years after the crime was committed. It was then that Arthur McGriff, an FPS officer, drove McCall home to his Suitland, Maryland apartment; during the drive McCall reportedly confessed to him that he had committed the July, 1980 Neal robbery. Later, apparently to convince McGriff of his story, McCall retrieved Neal's stolen service revolver from a bedroom dresser drawer and displayed it to McGriff. He also pointed out a special Sony television set that he claimed to have stolen from the Pentagon.

McGriff, though he was a police officer, did not act on McCall's confession until some five to six months later. In October, 1982, however, he reported the details of McCall's revelation to Detective Hernandez, who was in charge of the Neal robbery investigation. Hernandez took no action until December, when he apparently furnished the information to the FBI. The FBI later sought a warrant to search McCall's apartment for the stolen service revolver and the special Sony television. Agent Kolbicka, an FBI special agent, appeared before the magistrate on December 2, 1982. Kolbicka swore that a robbery had occurred in July, 1980, that McCall had confessed his involvement in the robbery to

McGriff in the spring of 1982 and had showed McGriff a service revolver that resembled the weapon stolen in the robbery as well as a special Sony television set that had been stolen from the Pentagon, that McCall had been on duty the night of the incident, and that McCall was about the same height as the man who reportedly had robbed Neal. The magistrate issued a warrant to search McCall's apartment for the revolver and the television set. The warrant identified McCall's then-current residence as Hillcrest Heights, Maryland, rather than the Suitland, Maryland apartment where McGriff had seen the revolver because the suspect had moved in the intervening period. Three FBI agents, including Kolbicka, accompanied by FPS detective Hernandez, searched McCall's Hillcrest Heights apartment and found the government service revolver that had been stolen from Neal hidden inside a velveteen pouch in a bedroom dresser drawer. Although the officers also found a Sony television set in the apartment, they could not confirm that the set had been stolen and it was not seized.

McCall was indicted on December 6, 1982, for the armed robbery of Neal. McCall's motion to suppress the revolver seized in the search of his apartment was denied. He waived his right to a jury trial and the case was tried before the district court on January 17, 1983.

Officer Neal, the victim of the July, 1980, robbery, died of cancer three weeks after McCall was indicted and about two and a half weeks before the trial date. Neal had not testified before the grand jury, nor had the government taken his deposition. The government, at trial, offered Neal's affidavit, taken by Detective Hernandez the day the robbery occurred. The affidavit was admitted over defense counsel's objection that it was hearsay not admissible under any exception under the Federal Rules of Evidence and that it violated McCall's rights under the confrontation clause of the sixth amendment.

Not only was the deceased Neal's affidavit admitted as the testimony of an unavail-able witness, but Detective Hernandez testified concerning the circumstances in which the affidavit was given. Hernandez claimed that, despite an indication in the affidavit to the contrary, Neal had been adamant that the robber was an FPS officer. Hernandez testified that Neal "specifically informed me that he thought it was another FPO." According to Hernandez, Neal insisted that this information be left out of the affidavit because "[h]e didn't want to get anybody in trouble."

Arthur McGriff, to whom McCall had confessed in the spring of 1982, also testified. He explained that McCall had admitted his responsibility for the robbery and had shown him a revolver and an allegedly stolen television set. The revolver that FBI agents had seized in the December search of McCall's Hillcrest Heights apartment was admitted over defense counsel's renewed motion to suppress.

## II. THE FOURTH AMENDMENT CLAIM

McCall first contends that the district court erred in refusing to suppress the revolver found in McCall's apartment as the fruits of an illegal search violative of the fourth amendment. Specifically, McCall argues, the information provided to the magistrate was too stale to furnish probable cause to believe that evidence of criminal activity then existed at the Hillcrest Heights premises named in the warrant. We disagree. He contends moreover that probable cause never existed in the first place with respect to the Hillcrest Heights apartment. McGriff had seen evidence of the robbery only at the Suitland apartment, never at the Hillcrest Heights apartment named in the warrant.

We first consider the staleness argument. The fourth amendment bars search warrants issued on less than probable cause, and there is no question that time is a crucial element of probable cause. A valid search warrant may issue only upon allegations of "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at

that time. Whether the proof meets this test must be determined by the circumstances of each case." *Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 140–41, 77 L.Ed. 260 (1932). *See also, e.g., United States v. Watson,* 423 U.S. 411, 449 n. 14, 96 S.Ct. 820, 840 n. 14, 46 L.Ed.2d 598 (1976) (Marshall, J., dissenting); *United States v. Freeman,* 685 F.2d 942, 951–52 (5th Cir.1982); *United States v. Beltempo,* 675 F.2d 472, 476–79 (2d Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); *United States v. Button,* 653 F.2d 319, 324–25 (8th Cir.1981). Consequently, evidence seized pursuant to a warrant supported by "stale" probable cause is not admissible in a criminal trial to establish the defendant's guilt.

■■■ Cases in which staleness becomes an issue arise in two different contexts. First, the facts alleged in the warrant may have been sufficient to establish probable cause when the warrant was issued, but the government's delay in executing the warrant possibly tainted the search. *See, e.g., United States v. Lemmons,* 527 F.2d 662 (6th Cir.1975) (five day delay), *cert. denied,* 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976); *United States v. Bedford,* 519 F.2d 650 (3d Cir.1975) (eight day delay), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976). Second, the warrant itself may be suspect because the information on which it rested was arguably too old to furnish "present" probable cause. *See, e.g., United States v. Minis,* 666 F.2d 134 (5th Cir.), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *United States v. Dennis,* 625 F.2d 782 (8th Cir.1980); *United States v. Rosenbarger,* 536 F.2d 715 (6th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977). A reviewing court's task in each category of cases is slightly different. In testing a warrant in the first category, it must decide whether a valid warrant became invalid due to the lapse of time; when considering those in the second category, it must determine whether information sufficient to constitute probable cause was ever presented. The court's fundamental concern, however, is always

the same: did the facts alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises searched?

■■■ This question is not resolved by reference to pat formulas or simple rules. "[T]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972). Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized. *Id.*

■■■ Many courts have found probable cause to exist despite substantial gaps between the observation of the evidence at a particular premises and the issuance of a search warrant. In *United States v. Minis, supra,* 666 F.2d 134, for example, the Court of Appeals for the Fifth Circuit determined that the ongoing nature of a marijuana-cultivating operation warranted the magistrate's inference that marijuana plants observed in June would still be present in October. *See also, e.g., United States v. Dennis, supra,* 625 F.2d 782 (ongoing loansharking operation); *United States v. Hyde,* 574 F.2d 856 (5th Cir.1978) (ongoing drug smuggling conspiracy); *United States v. Johnson, supra,* 461 F.2d 285 (illegal distillery). In some circumstances, the very nature of the evidence sought may suggest that probable cause is not diminished solely by the passage of time. In *United States v. Freeman, supra,* 685 F.2d 942, the fact that the items sought were bank records and identification papers that are not ordinarily destroyed or moved about from one place to another controverted potential staleness problems. *See also, e.g., Andresen v. Maryland,* 427 U.S. 463, 478–79 n. 9, 96 S.Ct. 2737, 2747–48 n. 9, 49 L.Ed.2d 627 (1976) (business records); *United States v.*

*Diecidue,* 603 F.2d 535, 560 (5th Cir.1979) (bullet fired into wall).

▬▬ When, as here, however, the criminal activity alleged in the warrant is not ongoing in nature, nor the evidence sought intrinsically likely to remain at the location where it was originally observed, indicia external to the evidence itself should demonstrate that probable cause has not lapsed. *See, e.g., United States v. Rahn,* 511 F.2d 290 (10th Cir.1975). The affidavit in *Rahn* recited that the defendant had stolen government-owned rifles two years previously, and that when the defendant stole the rifles, he had indicated his intention to retain them for several years in order to take advantage of an anticipated appreciation in value. A cursory check with area pawn shops indicated that Rahn had not disposed of the weapons. The Tenth Circuit Court of Appeals ruled that the magistrate could reasonably have concluded that Rahn still had the guns, even though nearly two years had passed since anyone had actually seen them in his possession. *See also United States v. Beltempo, supra,* 675 F.2d 472 (heroin traces spilled in pile rug and suitcases).

▬▬ The magistrate here knew that the stolen service revolver could readily be identified as government property and therefore would be difficult to pawn or sell. He knew that McCall had not disposed of the weapon during the twenty-month interim between the robbery and his confession to McGriff. Presented with McGriff's statement that McCall had confessed to the robbery and had displayed the revolver only seven months earlier, the magistrate was justified in drawing the inference that McCall probably still possessed the incriminating evidence in the Suitland apartment. The information provided in the affidavit supporting the warrant, then, was not too stale to furnish probable cause within the meaning of the fourth amendment.

▬▬ For much the same reason that we have rejected McCall's staleness claim, we cannot agree with his argument that there simply was no probable cause to search the Hillcrest Heights apartment because McGriff had actually observed the weapon in the Suitland apartment. There is no constitutional requirement that an affidavit must attest to a personal observation of criminal activity at the premises to be searched. *See, e.g., United States v. Rahn, supra,* 511 F.2d 290; *United States v. Mulligan,* 488 F.2d 732 (9th Cir.1973). The critical issue is whether there was probable cause to believe that the evidence was then located at the premises named in the warrant. As McCall had already kept the revolver at his residence for nearly two years after the robbery when he showed it to McGriff, it was reasonable to assume that he still had it at his residence seven to nine months later—even though his street address had changed during that interval. Although this would certainly not have been true if it were the kind of property that could have been easily exchanged or sold or if there had not been positive evidence of McCall's intention to retain it in his residence, we find the constitutional standard is satisfied in this case.

▬▬ We cannot, of course, approve generally of searches conducted pursuant to a warrant issued many months after evidence is observed at a criminal suspect's dwelling place. Nor do we condone the government's inexplicable two month delay in acting on McGriff's tip about McCall. We hold only that the unique facts of this case present no impropriety rising to the level of a fourth amendment constitutional violation.

### III. THE SIXTH AMENDMENT CONFRONTATION CLAIM

Neal, the robbery victim, died approximately three weeks after McCall was indicted and about two and a half weeks before McCall's trial began. At trial, his affidavit, taken by his fellow officer Hernandez, was admitted into evidence over McCall's objection. The affidavit and Hernandez's hearsay testimony "explaining" it contained statements both inculpating and exculpating McCall. McCall contends that admission of Neal's affidavit violated both

804(b)(5) of the Federal Rules of Evidence and the confrontation clause of the sixth amendment.

The government asserts in response that the affidavit bore sufficient indicia of reliability to satisfy the "equivalent circumstantial guarantees of trustworthiness" required by 804(b)(5) of the Federal Rules of Evidence. *United States v. Murphy*, 696 F.2d 282 (4th Cir.1982); *United States v. Garner*, 574 F.2d 1141 (4th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); *United States v. West*, 574 F.2d 1131 (4th Cir.1978). It also argues that the "indicia of reliability" found in the circumstances of obtaining the affidavit and admitting it into evidence insulate it from constitutional attack on sixth amendment grounds. Although the majority does not reach the sixth amendment question, I would hold that admitting the affidavit of an unavailable witness violated McCall's sixth amendment right to confront the witnesses against him. Before discussing the merits of the sixth amendment claim, I briefly set out my reasons for reaching the constitutional question.

This court has frequently and for good reason treated the Rule 804(b)(5) aspects of a criminal evidentiary matter concurrently with its sixth amendment aspects, *see, e.g., United States v. Murphy, supra*, 696 F.2d 282, 286; *United States v. West, supra*, 574 F.2d 1131, 1134–38, primarily because the two issues are so closely interwoven. Here, there is an additional reason to address the sixth amendment question: the problem posed by the harmless error rule. On this point I differ with my panel colleagues. In my view, if the trial court's only mistake had been misconstruing Rule 804(b)(5), we might well be required to find the error harmless under the standard enunciated in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The stricter standard for finding error harmless when it reaches constitutional proportions, however, would require a different result. That is, if the district court's action in admitting the affidavit offended only Rule 804(b)(5), that action was at least arguably not prejudicial in light of other evidence of guilt. For a sixth amendment violation to be harmless, however, we must be able to conclude beyond a reasonable doubt that the admission of the affidavit did not contribute to the conviction. *See Chapman v. United States*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It is clear to me that in this case we cannot draw such a conclusion.

I turn now to the merits of the sixth amendment claim. The circumstances surrounding the recording of Neal's statement weigh unevenly on the statement's reliability. Neal gave Hernandez the affidavit ninety minutes after the crime was committed; thus, it was nearly contemporaneous with the events it described. Both Neal and Hernandez were professional police officers and would have subjected themselves to prosecutions for perjury and subornation of perjury, respectively, had they intentionally falsified information in the affidavit. McCall was not linked to the robbery when Neal gave the statement to Hernandez and there was no apparent reason for the pair to have been untruthful or to have implicated McCall in the crime. These factors support the statement's reliability. On the other hand, some factors should have cautioned the court against relying on the affidavit as a truth-finding instrument. Hernandez, not Neal, actually recorded the statement. At trial, Hernandez sought to "supplement" or "correct" critical aspects of the affidavit. In the affidavit, Neal indicated that the robber was probably a motor pool employee. Hernandez, however, testified that Neal had said that he was sure the robber was an FPS officer.

The government argues, however, that despite any weakness that may inhere in the circumstances of obtaining Neal's affidavit, trial evidence corroborative of McCall's guilt complements the "indicia of reliability" upon which the trial court properly depended when it admitted the affidavit. It points to this court's opinions in *West, Garner,* and *Murphy* as approving trial courts' actions admitting hearsay evidence in parallel contexts.

In *West* we affirmed a trial court's action admitting the hearsay statement of a deceased witness in the form of a grand jury transcript. The circumstances in that case provided unusual guarantees of trustworthiness. The deceased witness, Brown, had testified before the grand jury concerning his meetings with West and others for the purpose of conducting narcotics transactions. Brown was placed under visual and electronic surveillance before each contact and photographed during the transactions. After each narcotics purchase a government agent reviewed with him the events that had transpired. In addition to the introduction of the grand jury transcript, government agents testified at trial that Brown's grand jury testimony was substantially the same as the information they had obtained from the surveillances, debriefings, and tape recordings. We held that there were both sufficient circumstantial guarantees of trustworthiness to satisfy Rule 804(b)(5) and sufficient indicia of reliability to satisfy the confrontation clause of the sixth amendment.

In *Garner* we again affirmed a trial court's action admitting the transcript of the previous grand jury testimony of an unavailable witness. Robinson, the witness, had appeared willingly before the grand jury and testified concerning narcotics transactions with the defendant in Europe. He refused, however, to testify at trial against the defendant, and the trial court ruled that he was an "unavailable" witness. The indicator of reliability upon which we rested our decision in *Garner* was the trial testimony of Miss McKee, a woman identified by Robinson in his grand jury testimony as his companion during the European transactions. There was also corroborative evidence of their travels, including records of airline tickets, customs declarations, passport endorsements, and European hotel registrations, and other corroborative evidence. We concluded in *Garner* that "it is enough that the grand jury testimony was admissible because of its strong corroboration by the testimony of Miss McKee and the undeniable records."

In *Murphy* we treated appeals from two different trials, in both of which the same two defendants were convicted of bank robberies. One Lattisaw had testified before the grand jury concerning the robberies but refused to testify at one of the trials. A transcript of his grand jury testimony was then admitted as a hearsay statement under Federal Rule of Evidence 804(b)(5). We also concluded that there were present sufficient indicia of reliability to meet the requirements of the sixth amendment. The "circumstantial guarantees of trustworthiness" and "indicia of reliability" of Lattisaw's grand jury testimony upon which we relied were found in the trial testimony of other witnesses that corroborated the information stated by Lattisaw in his grand jury testimony.

In *West* the circumstances which we found reliable were strong and typical of the "circumstantial guarantees of trustworthiness" usually held sufficient for the purposes of 804(b)(5). In *Garner* and *Murphy*, however, aside from the grand jury transcripts, the only badges of trustworthiness were evidence at trial corroborating the statements made by the witnesses in their grand jury testimonies. To that extent, *Garner* and *Murphy* support the government's position that there were circumstantial guarantees of trustworthiness bolstering Neal's affidavit, because independent trial evidence probative of McCall's guilt corroborated the affidavit. The testimony of another investigating officer and two police reports firmly established the fact of robbery, while McCall's alleged confession to McGriff corroborated Hernandez's hearsay testimony that an FPS officer was the robber. There is, however, a critical distinction between *Garner* and *Murphy* and this case. The previous statements in *Garner* and *Murphy* were recorded in grand jury transcripts. In this case the statement in controversy was recorded in a simple affidavit. This difference distinguishes the constitutionally admissible hearsay statements in *Garner* and *Murphy* from the constitutionally inadmissible one in this case.

In *West, Garner,* and *Murphy* we held hearsay statements admissible under the standards of both the Federal Rules of Evidence and the confrontation clause. As we said in *Murphy,* however, "we realize that the question that arises under the Rules of Evidence is not necessarily the same as that presented under the confrontation clause.... Something more may be required under the confrontation clause...."

A trial court has considerable discretion to determine admissibility of hearsay statements under the residual provision of Rule 804(b)(5). The Federal Rules of Evidence, designed to allow flexibility and growth, necessarily endow a trial court with great discretion in their application. In making 804(b)(5) rulings in a criminal case, however, a trial court is faced with an unavoidable conflict between competing judicial goals. While deliberating on the admission of hearsay evidence in the liberal spirit basic to the Federal Rules of Evidence, the court must keep in mind the constitutional restrictions of the confrontation clause of the sixth amendment.[1] It is true that the evidentiary hearsay rules and the constitutional confrontation rule "stem from the same roots," *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970) and that they "are generally designed to protect similar values..." *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). In a case such as we now consider, however, a court is faced both with the tension that is sometimes possible in the application of two rules and with the basic similarity of their purposes.

In *West, Garner,* and *Murphy* we decided both the Federal Rule of Evidence 804(b)(5) issue and the sixth amendment confrontation clause issue, reasoning that both standards were plainly satisfied in each case. I do not feel that either standard was satisfied in the case *sub judice,* though the 804(b)(5) issue is much closer. Considering the ambivalent nature of Neal's statement and Hernandez's testimony, the affidavit in controversy probably is not clothed with sufficient "circumstantial guarantees of trustworthiness" to satisfy 804(b)(5).[2] On the other hand, I am not prepared to restrict the admission of hearsay statements under 804(b)(5) criteria by rote exclusion of any particular form, including that of a simple affidavit. Because McCall's sixth amendment rights were so obviously violated, however, I feel it is not necessary to resolve the 804(b)(5) issue.

In *Garner* and *Murphy* we held that admitting transcripts of the grand jury testimony of unavailable witnesses under the circumstances of those cases was constitutionally permissible. The principal issue in this case is simply whether we shall accord a simple affidavit the same respect as a truthfinding instrument that we did a grand jury transcript.

The Supreme Court has not chosen to consider, as have this and several other courts, the effect of recording a statement in a grand jury proceeding upon its subsequent admissibility as the hearsay statement of an unavailable witness. *See Garner v. United States,* 439 U.S. 936, 937, 99 S.Ct. 333, 334, 58 L.Ed.2d 333 (1978) (Stewart, J., dissenting from denial of certiorari). In *California v. Green, supra,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, how-

---

**1.** "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to conclude that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception." *California v. Green, supra,* 399 U.S. at 155–56, 90 S.Ct. at 1933–34. *See also Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**2.** As noted *supra,* there is, I feel, a close question as to whether this error would be grounds for reversal if admitting the affidavit implicated only the nonconstitutional evidentiary issue.

ever, the Supreme Court upheld the admission of hearsay evidence in the form of a transcript of testimony from a preliminary hearing because it "found the guarantees of trustworthiness in the accouterments of the preliminary hearing itself." *Ohio v. Roberts,* 448 U.S. 56, 73, 100 S.Ct. 2531, 2542, 65 L.Ed.2d 597 (1980), discussing *California v. Green.* The preliminary proceedings involved in *Green* included extensive cross-examination by defendant's counsel and to that extent its sixth amendment "accouterments" concededly were of a higher order than those of grand jury proceedings where the witnesses are presented selectively by the prosecution and are not subject to defense cross-examination. Nevertheless, grand jury proceedings, with their attendant formalities—official recording of testimony, protection against witness abuse, and official supervision—afford greater protection for the accuracy of the truthfinding process than does the taking of *ex parte* affidavits. Although neither *West, Garner* nor *Murphy* stressed this, the fact that the hearsay involved in *West, Garner,* and *Murphy* had been recorded in a grand jury proceeding, rather than in some less formal proceeding, influenced our actual holding that additional corroborative evidence sufficed to clothe the grand jury transcripts with adequate "indicia of reliability" to satisfy the sixth amendment.

In *West, Garner,* and *Murphy* we reviewed the controlling principles of this area of sixth amendment law in some detail. It is not necessary to travel those paths again except to determine whether recording a statement in an affidavit form can afford equivalent protection for the truthfinding process as does recording similar statements in grand jury proceedings or a preliminary hearing.

Justice Brown's definitive statement prohibiting the use of hearsay evidence in criminal trials in *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) is the necessary starting point for this discussion.

The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Id.* at 242–43, 15 S.Ct. at 339–40.

Despite *Mattox,* it is now, of course, axiomatic that many kinds of hearsay are admissible into evidence in a criminal trial, notwithstanding the seemingly absolute dictates of the sixth amendment, as long as they contain sufficient indicia of reliability. *See Ohio v. Roberts, supra,* 448 U.S. at 63–64, 100 S.Ct. at 2537–2538; *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *California v. Green, supra,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489; *Pointer v. Texas, supra,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923.

In virtually all of its opinions in this area, however, the Supreme Court has continued to stress that a principal concern of the sixth amendment is the right to confrontation.

Our own decisions seem to have recognized at an early date that it is this literal right to "confront" the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause.

*California v. Green, supra,* 399 U.S. at 157, 90 S.Ct. at 1934.

The historical evidence leaves little doubt, however, that the Clause was intended to exclude some hearsay ... The Court has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that "a primary interest secured by [the

provision] is the right of cross-examination."

*Ohio v. Roberts, supra,* 448 U.S. at 63, 100 S.Ct. at 2537 (citations and footnote omitted).

The Court has allowed the introduction of hearsay evidence under competing policy considerations [3] only when the other "indicia of reliability" perform a role equally as protective of the truth-finding process as confrontation. *Ohio v. Roberts, supra,* 448 U.S. at 65–66, 100 S.Ct. at 2538–2539. "[T]he Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Id.* at 65, 100 S.Ct. at 2539, *quoting Snyder v. Massachusetts,* 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934).

In effect, we held in *West, Garner,* and *Murphy* that the "accouterments" of grand jury proceedings, bolstered by corroborative trial evidence, in proper cases can perform an equally protective role for the truth-finding process as do confrontation procedures. Aside from the routine administration of an oath, however, the composition of a non-judicial affidavit is accompanied by no symbol or procedure protective of the truth-finding process. Its previous use in criminal trials was precisely what concerned the framers of the Constitution when they drafted the confrontation clause. There may be instances where an affidavit corroborated by other trial evidence presents sufficiently strong circumstantial guarantees of trustworthiness to pass non-constitutional muster under Rules 803 and 804(b)(5) of the Federal Rules of Evidence, but the bare affidavit of an unavailable witness reinforced only by trial evidence probative of guilt will rarely if ever bear the indicia of reliability necessary to substitute for the protection offered by the confrontation clause of the sixth amendment.

The judgment of the district court is reversed and remanded for proceedings consistent with the views expressed in this opinion.

REVERSED AND REMANDED.

WIDENER, Circuit Judge, concurring:

Although I concur in Judge Sprouse's opinion on the question of the validity of the search and in the result reached in that opinion on the admissibility of Officer Neal's statement and Officer Hernandez' testimony with respect to it, I think it unnecessary to the decision and so do not reach the question of admissibility under the confrontation clause. *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (Justice Brandeis concurring). Of course, I do not disagree in the abstract with the result Judge Sprouse would obtain under the confrontation clause. See *United States v. Payne,* 492 F.2d 449, 455 (4th Cir.1974) (dissenting opinion). I note that this concurring opinion is the opinion of the court on the question of the admissibility of the statements.

 I am of opinion that neither the affidavit of Neal nor Hernandez' testimony with respect to it is admissible. The need for their introduction was due to the untimely death, and thus unavailability, of Neal.[1] Mere unavailability, however, is an insufficient reason to justify the admissibility of those statements, and the use of Neal's statement in the trial amounted to no more than the trial by affidavit the hearsay rule prevents. See 5 *Wigmore on Evidence* (Chadbourn Ed.) § 1364 (1974). Hernandez' explanation of Neal's statement stands on even weaker ground than Neal's statement as it attempts to explain away those parts of Neal's statement favorable to the defendant.

Hearsay testimony is no less inadmissible now under FRE 802 than it was under *Queen v. Hepburn,* 11 U.S. (7 Cranch.) 290, 3 L.Ed. 348 (1813). The reasons for its exclusion are as true today as they were

---

**3.** *Chambers v. Mississippi, supra,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; *Dutton v. Evans, supra,* 400 U.S. at 86, 91 S.Ct. at 218.

**1.** The robbery took place on July 6, 1980. Neal died on December 27, 1982.

when *Queen* was decided, the human condition having changed little, if at all, with the passing years. The quotation from *Queen,* "[i]ts intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover . . . ," *Queen,* 11 U.S. (7 Cranch.) at 295, well states the case.

 Just as *Queen,* p. 295, set out certain exceptions to the hearsay rule, Congress in enacting the Federal Rules of Evidence also adopted certain exceptions. Unless hearsay evidence is admissible under one of the exceptions enumerated in the Rules, a rule of the Supreme Court or Act of Congress, it is nevertheless inadmissible under FRE 802 subject only to the exception that the requirements of FRE 803(24) or 804(b)(5) are met. FRE 802; Saltzburg and Redden, *Federal Rules of Evidence Manual* (3rd Ed.1982), p. 566. The government does not claim the evidence in question is admissible under an explicit exception to the hearsay rule, under rule of the Supreme Court, or under Act of Congress; it maintains that Neal's statement and Hernandez' testimony with respect to that statement are exceptions to the hearsay rule under Rules 803(24) and 804(b)(5).

The pertinent text of Rules 803(24) and 804(b)(5) is phrased in exactly the same language, the first although the declarant may be available as a witness and the latter if unavailable. The text is:

"A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

There is no doubt the statements were offered as evidence of material facts. While there may be some argument that

the statements were more probative than any other evidence which could be procured through reasonable efforts, for the purpose of this opinion I will consider that such is the case. Whether the general purpose of the rules and justice would best be served by admitting the statement is a matter which need not be considered here. This leaves the question on which the case turns as whether or not Neal's statement and Hernandez' explanation of Neal's statement have such equivalent circumstantial guarantees of trustworthiness to make the statements admissible despite their hearsay character.

 Affidavits are within the prohibition of the hearsay rule. 5 *Wigmore on Evidence* (Chadbourn Ed.) § 1362 (1974). Thus, the mere fact that a statement which is sought to be introduced is in the form of a written affidavit is not a sufficient guarantee of trustworthiness, and additional guarantees must be shown to permit the introduction of the statement.

Neal's written statement to Hernandez, to repeat, contained in part the following:

"To be honest, I think I have seen that guy somewhere before. I don't know if it was an FPO or someone who worked at the motor pool, but if I saw him again I may recognize him. I think it was one of the motor pool employees, I think. . . . The guy who I think robbed me that I said I think work at the motor pool drives a Cadillac and is brown skinned. I am not sure but it seems to fit that guy."

The court admitted Neal's written statement. It is at once apparent that the statement did not implicate McCall for McCall was an FPO, did not work at the motor pool, and drove a Camaro rather than a Cadillac, as Neal knew at the time he made the statement.

The court, in addition, allowed Hernandez to testify as to other statements Neal had made to him at the time which Hernandez did not include in Neal's written statement. Among them were:

"... he was very adamant in stating to me that he knew the person, somehow he knowed who the person was."

"He said, but I am pretty sure that my feeling is that it is another FPO."

"... but, he said, Hernandez I have got a feeling it is an FPO."

"I asked him to call a name. He said, I don't want to get anybody in trouble. I don't want to call a name, but I am pretty sure it was a FPO."

"... but he specifically informed me that he thought it was another FPO and he didn't want to call the person's name."[2]

Hernandez testified that he did not include in Neal's affidavit the above quoted statements he attributed to Neal because Neal asked him not to. Of equal significance, Hernandez did not even tell his supervisor or the United States Attorney's office about the statements until the case was reopened some two years later. Apparently the matters included in the quotations were included in no report of Hernandez.

The testimony of Hernandez with respect to Neal's statements to him which were not included in Neal's affidavit are the purest hearsay. They are statements "... other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FRE 801(c). They have no circumstantial guarantee of trustworthiness and are inadmissible under any standard. If such statements were admitted in criminal prosecutions, it would amount to opening the door to admitting into evidence the file of the investigating officers in criminal prosecutions without the production of the witnesses.

Neal's written statement also has insufficient, if any, circumstantial guarantees of trustworthiness. The written statement of Neal is contradicted by the oral statements Neal made to Hernandez, and far from corroborating Neal's written statement, the oral statements Neal made to Hernandez are indications that his written statement is unreliable at best, and perhaps simply not true, when it is remembered that Neal and McCall were fellow FPO officers, had known each other since their training days some years before, McCall supposedly talked to Neal during the robbery and Neal had failed to recognize McCall as the robber, although working with him for more than two years after the robbery.

 I am thus of opinion that the written statement of Neal and the oral testimony of Hernandez with respect to Neal's statements to him were both inadmissible as hearsay under FRE 802, and that neither is admissible as an exception to the hearsay rule under FRE 803(24) or 804(b)(5). I would grant a new trial, for the error is not harmless.

I am authorized to state that Judge MURNAGHAN concurs in this opinion.

---

**2.** These quotations obviously are not all in complete context.