16 F.3d 413
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dean Alan WEST, Defendant-Appellant.
 No. 93-5237.
 United States Court of Appeals, Fourth Circuit.
 Jan. 27, 1994.
Argued Oct. 29, 1993.
Decided Jan. 27, 1994.
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Elkins. Frederick P. Stamp, Jr., District Judge. (CR-92-122)
 Steven Morris Askin, Askin, Burke & Schultz, Martinsburg, WV, for appellant.
 Thomas Oliver Mucklow, Asst. U.S. Atty., Wheeling, WV, for Appellee.
 William D. Wilmoth, U.S. Atty., Wheeling, WV, for appellee.
 N.D.W.Va.
 AFFIRMED.
 Before NIEMEYER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Dean A. West was convicted of four counts, charging him with drug trafficking violations in Charles Town, West Virginia during January and February of 1992. He was sentenced to 15 months imprisonment. His appeal raises challenges directed at all aspects of his trial. For the reasons that follow, we affirm.
 
 
 2
 * In December 1991, the West Virginia State Police in Martinsburg, West Virginia began an undercover operation to purchase cocaine with the help of David McMasters, a confidential informant, from Dean West and a co-conspirator, Pat McGowan. The undercover officers made five separate cocaine purchases during January and February of 1992.
 
 
 3
 The informant set up the first purchase of an "eight-ball" of cocaine to take place on January 10, 1992. On that date, an undercover officer, Trooper Tucker, followed Pat McGowan to a Charles Town, West Virginia subdivision, gave her the buy money, and waited at the entrance to the Westridge Hills subdivision until she returned with the cocaine, whereupon the transaction was consummated.
 
 
 4
 A week later, on January 17, Trooper Tucker and another officer, Trooper Wagoner, again purchased cocaine from McGowan. This time, the three waited outside the subdivision entrance for McGowan's source. After a Toyota truck drove past them, honking its horn apparently as a signal to McGowan, McGowan took the buy money from the officers and drove into the subdivision. A third officer, Sergeant Griffith, who was conducting surveillance of McGowan, observed her car in the driveway of Dean West's house, where the Toyota truck was also parked. McGowan returned shortly and handed the purchased cocaine to the undercover officers.
 
 
 5
 On January 21, 1992, the troopers again met McGowan outside the subdivision, where she told them that her source no longer felt comfortable dealing at his house and would meet her on the road. Sergeant Griffith, who was again conducting surveillance, observed McGowan walk away from the officers towards a truck parked a short distance away, from which she obtained the cocaine and returned to complete the transaction with the troopers. Officer Griffith observed West standing near the truck, watching the transaction between McGowan and the officers.
 
 
 6
 The fourth transaction took place on January 28, 1992, when McGowan met the troopers outside the subdivision, took the money, and entered the subdivision on foot. Two officers conducting surveillance observed McGowan and West leave the vicinity of West's house in the Toyota truck and drive back towards the meeting site, whereupon McGowan left the truck and delivered the cocaine to the undercover officers. Trooper Tucker then asked McGowan if she needed a ride. She refused, saying that "her guy" or "her supplier" was going to give her a ride. In the meantime, the surveillance officers observed West drive back to his residence in the truck and return to pick up McGowan and drive her to Charles Town. As they drove past, two troopers observed McGowan and West as its occupants.
 
 
 7
 The final transaction took place on February 7, 1992, when the troopers paid McGowan for the cocaine with $600 in $20 bills, the serial numbers of which had been recorded earlier. Sergeant Griffith observed McGowan entering West's house, from which she returned with the cocaine and gave it to the troopers. After she left, the police executed a search warrant obtained two days earlier to search West's residence. The affidavit supporting the warrant had detailed the four previous drug transactions and the nexus of facts tying McGowan to West. West returned to his house while the search was in progress and was arrested. The police recovered all but $20 of the pre-recorded money, as well as two sets of triple-beam scales and a quantity of Inositol, a white powdered food supplement commonly used to "cut" pure cocaine for street use.
 
 
 8
 At trial, the items seized after the fifth transaction were introduced as evidence and the eight local and state officers participating in the investigation testified, as did the confidential informant who initiated the series of drug purchases.
 
 II
 
 9
 West first contends that the district court erred in failing to grant his motion to suppress evidence seized from his home during the February 7, 1992 search. He contends that the warrant was improperly issued because (1) probable cause did not support its issuance; (2) it was overly broad; (3) it was stale when executed; and (4) the warrant was based upon information given by West's co-conspirator, Pat McGowan, who was an unreliable source of information. Each of these contentions lacks merit.
 
 
 10
 On the first point, the magistrate judge who issued the warrant was presented with evidence amply establishing probable cause to believe that evidence of a crime could be found at the place to be searched. The affidavit supporting the warrant application, authored by Special Agent West of the FBI, specifically detailed each of the first four drug buys, in each case tying West's residence or a vehicle parked there to the cocaine purchased through McGowan. The affidavit also showed that during the fourth transaction, McGowan told the officers that "her guy" or "her supplier" would give her a ride and that she was later observed being given a ride by West back to Charles Town in the truck registered to West's wife, which was the same truck observed parked at his home on several separate occasions. In these circumstances, the district court was justified in denying the motion to suppress based on a contention that the warrant was improperly issued. See United States v. Anderson, 851 F.2d 727 (4th Cir.1988), cert. denied, 488 U.S. 1031 (1989) (holding that a warrant application need not detail every specific relevant fact in order to establish probable cause, so long as that inference may reasonably be drawn from the facts shown).
 
 
 11
 West also argues that the warrant to search his home was overly broad. He claims that the warrant was not reasonably specific because it did not list the serial numbers of all of the $20 bills used as payment for the cocaine and seized from his house. In fact, only the serial numbers on $360 of the currency seized during the search of appellant's house were included, and the serial numbers on an additional $220 seized during the search were not listed. That additional items were seized in response to the warrant does not render the warrant overly broad. In fact, only the opposite may be argued--the warrant describes the items related to the criminal enterprise more narrowly than what was eventually seized. We conclude that simply because the serial numbers of every bill of U.S. currency seized during the search in this case were not detailed in the warrant does not invalidate it. See Andresen v. Maryland, 427 U.S. 463, 479-480 (1976).
 
 
 12
 West also contends that the warrant was stale because the search was conducted on February 7, 1992, which was ten days after the last previous transaction. Again, we find the argument without merit. Staleness is determined by the court's inquiry of whether "the facts alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises." United States v. McCall, 740 F.2d 1331, 1336 (4th Cir.1984). In Anderson, supra, we held that a warrant to search the defendant's house for a pistol and silencer used in a crime committed five weeks earlier was not stale, even though the warrant application did not specify at what time during the intervening period the weapon was offered for sale to the confidential informants who tipped off the police. And in McCall, supra, we held that a warrant to search the defendant's house for a weapon used in a crime was not stale even though it was issued seven months after the defendant confessed to the crime and displayed the weapon to a police officer, because the weapon was readily identifiable as government property and thus could not be easily pawned and because the defendant had held onto it for the twenty-month period between the commission of the crime and the confession. In this case the fact that ten days had passed between the last date of surveillance and the issuance of the warrant does not render the warrant stale particularly since the four prior transactions occurred in a series that began about 30 days earlier. Moreover, this evidence tended to show that West's home was an ongoing supply site for a drug distribution operation and therefore supplier's paraphernalia and the fruits of drug crimes would be found there even ten days after the last previous transaction.
 
 
 13
 Finally, West argues that the warrant was flawed because it was based upon information given by his co-defendant and alleged co-conspirator Pat McGowan, who was an unreliable source for such information. The argument, however, is based on a misconception of McGowan's contributions to the warrant's issuance. The affidavit supporting the warrant identified McGowan as a conspirator and not an informant. Moreover, while it recited certain incriminating statements that McGowan had made in the course of selling cocaine to them, all such statements were made to undercover officers and were supported by their testimony and not by McGowan's.
 
 III
 
 14
 West next argues that the district court should not have allowed two officers to identify him in court, on the theory that their ability to identify him came from their unauthorized presence in his home when executing the search warrant on February 7, and that because the search violated the Fourth Amendment, their identification of him was "fruit of the poisonous tree" and thus inadmissable. At trial, Sergeant Griffith identified West as the same man he had observed while carrying out surveillance of the third and fourth drug buys. And Officer Catlett testified that West, who was arrested when he came home during the search on February 7, was the same man as the one Officer Catlett observed operating the pickup truck that picked up McGowan from the road after the fourth drug buy.
 
 
 15
 West's argument fails with its basic premise that the February 7 search violated West's Fourth Amendment rights. As discussed above, the search did not violate West's Fourth Amendment rights. Moreover, any illegality of the search of West's house would not compel the conclusion that the identification was improper. Both officers observed West on more than one occasion prior to the execution of the search warrant and could have identified the defendant in court solely on that basis.
 
 IV
 
 16
 West contends that his conviction was not supported by evidence sufficient to convict him beyond a reasonable doubt, and that the district court committed reversible error in refusing to grant his Rule 29 motion for acquittal. The record at trial belies his claim. The government introduced ample direct and circumstantial evidence for a trier of fact to have found West guilty beyond a reasonable doubt on each count. Moreover, the evidence was not thin. During the three day trial, the government presented ten witnesses, eight of them law enforcement officials, and twenty-six exhibits. While West was not required to put on any evidence, it is revealing that he presented only one witness, the desk clerk of the Cliffside Inn, who testified that there was no traffic light at the entrance to the Inn, to contradict the statement of Officer Catlett, who had testified that while stopped at a light near the entrance of the Cliffside Inn, he and Sergeant Griffith saw West and McGowan in West's truck, driving toward Charles Town after the fourth drug purchase on January 28, 1992.
 
 V
 
 17
 West next contends that an inculpating statement imputed to McGowan was inadmissible hearsay evidence. At trial, Troopers Tucker and Wagoner testified that after the fourth drug buy, on January 28, 1992, McGowan declined their offer of a ride to Charles Town because she was expecting her supplier to give her a ride after they left. Overruling West's objection to this testimony as hearsay, the court concluded that the officers' statements about what McGowan said was not hearsay, but rather was admissible against West as the statement of a co-conspirator in furtherance of a conspiracy pursuant to Federal Rule of Evidence 801(d)(2)(E). West contends that the district court violated our holding in United States v. Urbanik that:
 
 
 18
 [t]he agency fiction that allows the statements of conspirators to be imputed to co-conspirator defendants is limited ... by the requirement that statements be admitted under this rule only if they are made both in the course of and in furtherance of the conspiracy.
 
 
 19
 801 F.2d 692, 697 (4th Cir.1986) (emphasis added). West argues that because the statement imputed to McGowan was purportedly made after the conclusion of the drug transaction, it was not "in furtherance of" the conspiracy.
 
 
 20
 We believe that West's view of the conspiratorial conduct is too narrow. Clearly, he and McGowan had reached prior agreement on the details of the fourth transaction, including its time, place, and how it was to be staged. McGowan's arrangement for getting to and from the transaction site was obviously part of the agreed-to plan. This became yet more evident from the variations of transportation and site arrangements in earlier transactions. Thus, when McGowan stated after the fourth transaction that she did not need a ride because her supplier was taking care of transportation, she was clarifying for the officers some of the remaining acts agreed to earlier by West and McGowan to carry out the deal. Her statement was properly admitted in evidence as a conspiratorial admission.
 
 
 21
 The circumstances in Urbanik are distinguishable. In Urbanik, a third party testified that a co-conspirator identified the defendant as the person who supplied him with marijuana for distribution and as "a little short guy" who could bench press 300 pounds. This remark was found not to be in furtherance of the conspiracy but rather a casual aside during a conversation between the two about weight lifting, having nothing to do with drug distribution.
 
 VI
 
 22
 West contends also that certain comments and questions by the prosecutors at trial were improper and prejudicial. These challenges break down into two distinct categories: five allegedly improper questions during the government's case-in-chief and one allegedly inflammatory remark during closing argument.
 
 
 23
 The allegedly improper questions are exemplified by the following leading question posed on direct examination by the government's attorney to Sergeant Griffith, the officer in charge of surveillance for the sting operation: "Is there any question in your mind, Sergeant Griffith, that on the first occasion of the 21st of January, 1992, that this is the individual you saw out by the road?" (indicating West). The other four questions objected to are of a similar nature. While the leading character of these questions was in these circumstances inappropriate, West has not shown how any of them or all of them in aggregate affected the outcome of the three-day trial. The evidence elicited by each challenged question was accumulative. We conclude that at most these questions amounted to harmless error. See United States v. Harrison, 716 F.2d 1050, 1051 (4th Cir.1983), cert. denied sub nom. Wissler v. United States, 466 U.S. 972 (1984).
 
 
 24
 West also objects to a potentially inflammatory statement made by the government during closing argument: "That is one problem with trying to do battle with the drug trade. Who is the most visible? It is not the big importers that are bringing it in from Colombia. It is the street dealer." West relies on United States v. Solivan, 937 F.2d 1146, 1153 (6th Cir.1991), in urging that the remark was sufficiently prejudicial to require a new trial. In Solivan, the prosecutor attempted in closing argument to appeal to the jury's fears by telling them that a conviction of the defendant for drug trafficking was needed to keep drugs out of Northern Kentucky, and the Sixth Circuit ordered a new trial, finding the remarks prejudicial.
 
 
 25
 While the association of a defendant with the Colombian drug trade can be reversible error in the absence of evidence, we believe the remark West challenges here falls short of being reversible error. The prosecutor here sought to distinguish the defendant from the Colombian drug importer. Moreover, when an objection was made, the district court attempted to cure the problem or to prevent any misunderstanding by telling the jury that there was no evidence of any Colombian nexus in this case. Finally, the prosecutor thereafter also sought to clarify his remark, indicating that the street dealer to whom he was referring was McGowan, who was being tried along with West. Because the remark was intended to make a distinction, was clarified, and was directed against McGowan, not West, we cannot conclude that the remark introduced prejudicial error into the proceedings, particularly when we consider the weight of the evidence against West. See Harrison, 716 F.2d at 1052-3 (where case against two drug defendants was already strong, stray improper remark by prosecutor during closing arguments was not prejudicial enough to warrant reversal, especially when judge offered curative instructions to jury.); cf. United States v. Salama, 974 F.2d 520, 522-23 (4th Cir.1992), cert. denied, 113 S.Ct. 1345 (1993).
 
 VII
 
 26
 In addition to his numerous challenges to his underlying conviction, West also attacks his sentence, particularly the district court's failure to grant him a two-step reduction in his offense level under the sentencing guidelines for acceptance of responsibility[1] and the court's enhancement of the offense level for his being an organizer or manager.[2] On the acceptance-of-responsibility issue, West contends that the failure to reduce his offense level was error because it was based on the probation officer's recommendation that no reduction be applied to West's sentence on the grounds that, because he had proceeded to trial and attempted to minimize his offenses, he had not accepted responsibility. The court's reliance upon the probation officer's recommendation, West argues, violates his due process rights by penalizing him for his exercise of his constitutional right to a trial. West maintains, moreover, that his testimony at the sentencing hearing clearly indicated that he accepted responsibility for his wrongdoing.[3]
 
 
 27
 The election to go to trial and the conviction by jury trial do not necessarily preclude the application of U.S.S.G. Sec. 3E1.1, allowing a sentence reduction for acceptance of responsibility. See United States v. Broussard, 987 F.2d 215, 224 (5th Cir.1993). The district court was aware of this, mentioning it during the sentencing:
 
 
 28
 ... I want to make it clear that I think that the mere fact that a defendant goes to trial and exercises a constitutional right not to testify or to incriminate himself does not in and of itself cause him to lose the acceptance of responsibility reduction. My problem with this application in this case is that I find the statement of the defendant to be somewhat equivocal, and ... I think that having had the opportunity to observe, read the statements, observe the defendant, observe the trial, hear the evidence, and consider the jury's verdict, I would find that the acceptance of responsibility in this particular case is not warranted.
 
 
 29
 Thus, the district court did not apply a penalty for West's electing to be tried, but rather it considered all the relevant factors in exercising discretion whether to allow the reduction. The district court is always in a better position than is the appellate court to weigh the defendant's statements of remorse against his demeanor, the timeliness of the acceptance of responsibility, and the weight of the evidence presented against the defendant at trial. See United States v. Harris, 882 F.2d 902 (4th Cir.1989).
 
 
 30
 West also objects to having his sentence enhanced by two levels for being an organizer or manager of a criminal activity, under U.S.S.G. Sec. 3B1.1(c). In order to prevail on this point, West must prove that the district court's findings on this issue were clearly erroneous. See United States v. White, 875 F.2d 427, 433-434 (4th Cir.1989). The core of West's argument is that the district court did not make specific factual findings to justify the enhancement. The record, however, demonstrates otherwise. At the sentencing, the district court stated:
 
 
 31
 I would ... sustain the position of the probation officer, deny the objection of the defendant on the increase as being an organizer and leader. And in that respect, I would make these findings of fact. I think that the testimony as I recall it and in looking at my notes and considering the presentence report, would indicate that Mr. West was an organizer and leader of this effort.... Mr. West did, it seemed to me, play a substantial role in structuring these transactions, in observing the transactions to make sure that they were carried out at appropriate times and places and witnessing these things from vantage points that he had ... The conduct of Mary McGowan and the conduct of Rhonda Plymale[4] and through their testimony indicates that Mr. West was an organizer and leader. The existence of the scales in the home, the presence of the buy money, all in my belief sustain the position of the United States Probation Officer that he was an organizer and manager under Guideline 3B1.1(c). These findings are all supported by the testimony at trial and are not clearly erroneous.
 
 
 32
 For the reasons given, the judgment of the district court is
 
 
 33
 AFFIRMED.
 
 
 
 1 U.S.S.G. Sec. 3E1.1(a) provides:
 If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.
 Application Note 2, in the Commentary following this guidelines section, prescribes the relevant weight to be accorded to a defendant's invocation of his right to a trial:
 This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.
 2 U.S.S.G. Sec. 3B1.1. provides:
 Based on the Defendant's role in the offense, increase the offense level as follows:
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 [3]
 At the sentencing hearing, the defendant testified as follows:
 I have--I know I made a mistake. I mean, a real big mistake in my life. And when I was in Winchester, down there at the regional jail in Winchester, I had a lot of time to think. I really miss my family and miss being with them. I am real sorry for what I have done. I mean, I know I did and what I did was wrong, but my family means more to me than a whole lot.
 J.A. 246.
 
 
 [4]
 Plymale was the initial contact between the confidential informant and McGowan, and testified at trial that she had bought cocaine from McGowan several times. J.A. 76-77