**ARKANSAS CHRONICLE, a division of Sienna Broadcasting Corp., et al., Plaintiffs,**

v.

**R. Mark EASLEY, et al., Defendants.**

**No. CIV.A. 1:04cv110.**

United States District Court,
E.D. Virginia,
Alexandria Division.

June 17, 2004.

Benjamin G. Chew, Patton Boggs LLP, Washington, DC, for Plaintiffs/Movants.

Robert M. Ross, Assistant County Attorney, Fairfax, VA, for Defendants/Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this action, plaintiffs, a journalist and his employer, claim that defendants violated their First and Fourth Amendment rights by conducting a search of the journalist's home and his home-office in Virginia based on a Virginia warrant that was impermissibly broad and based on stale and incomplete, and therefore inaccurate, information that fell far short of probable cause. Defendants, two officers involved in obtaining and executing the warrant, claim that the *Rooker–Feldman* doctrine operates to bar adjudication here of plaintiffs' claims because an Oklahoma state court has already ruled that the Virginia warrant and search were legal. Defendants also contend that they committed no constitutional violations in obtaining and executing the search warrant and, in any event, that they are entitled to qualified immunity for their actions in this regard.

At issue on cross-motions for summary judgment, therefore, are the following questions:

(i) whether the *Rooker–Feldman* doctrine bars consideration of plaintiffs' constitutional claims in federal court;

(ii) whether the search in question violated plaintiffs' Fourth and First Amendment rights; and

(iii) if so, whether defendants are entitled to qualified immunity for their actions.

## I.

There are two plaintiffs in this action: one corporation and one individual. The individual plaintiff, John Culbertson, a Virginia citizen, is a professional journalist who maintains a home and a home-office in Fairfax County, Virginia. Culbertson is an employee of the Arkansas Chronicle, a wholly-owned division of plaintiff Sienna Broadcasting Corporation, a publicly-held Delaware electronic media corporation that gathers and sells news stories of current interest. Since early 1999, Culbertson has been the Washington, D.C. Bureau Chief of the Arkansas Chronicle. As part of his customary duties, Culbertson maintains a home-office in his Fairfax County residence. In his capacity as Bureau Chief for the Arkansas Chronicle, Culbertson routinely gathers news and information. Since 1999, he has gathered and stored information relating to the 1995 Oklahoma City bombing and has written or contributed to several published articles on the bombing. It appears from the record, however, that the Arkansas Chronicle has recently fallen on hard times. In Culbertson's words, it is a company "that's dormant and trying to come back" and it appears from the record that the Chronicle ceased publication of any articles from roughly 2000 until early February 2004.[1]

Of the original seven defendants, only two remain.[2] They are Robert J. Murphy and Steven G. Milefsky, both detectives in

---

1. A visit to the Arkansas Chronicle's website reveals that the Chronicle has published two articles in the recent past, one dated February 13, 2004 and another dated March 6, 2004. *See www.arkansaschronicle.com* (last visited June 4, 2004). From the website, it does not appear that the Chronicle has published any of its own stories since March 6, 2004.

2. Defendant John T. Frey, Clerk of the Circuit Court of Fairfax County, was dismissed from the case with the consent of plaintiffs by Order dated February 5, 2004. *See Arkansas Chronicle, et al. v. R. Mark Easley, et al.,* Civil Action No. 1:04cv110 (E.D.Va. Feb. 5, 2004) (Order). A second original defendant, Mark Easley, an Oklahoma City police detective, and Oklahoma City, an intervenor defendant, exited this lawsuit by way of a $60,000 settle-

the Homicide Division of the Fairfax County Police Department.

This civil suit has its origins in the highly-publicized state prosecution of Terry Nichols for his role in the infamous 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City in which 161 people were killed. Timothy McVeigh and Terry Nichols were both prosecuted and convicted for this terrorist act in federal court. As a result of his federal conviction for this heinous crime, McVeigh was sentenced to death in 1997 and subsequently executed by lethal injection in 2001. Nichols, however, was sentenced to life in prison without parole as a result of his federal conviction for his role in the bombing.

Since then, the State of Oklahoma charged Nichols with capital murder for his role in the Murrah building bombing and that capital trial is currently underway in the District Court of Oklahoma County. Recently, an Oklahoma jury convicted Nichols of 161 counts of murder and he now awaits sentencing by the judge, as the jury deadlocked on whether to impose the death penalty.

On January 27, 2004, Nichols, by counsel, filed in the Oklahoma state court an Ex Parte Sealed Emergency Motion for Order to Preserve Evidence and for Subpoena Duces Tecum. In that motion, Nichols' counsel described circumstances that suggested the existence of evidence located outside Oklahoma that might be relevant to the trial. Specifically, Nichols' counsel related to the Oklahoma court that they had spoken with an attorney located in Dallas, Texas named Thomas W. Mills, Jr. According to the motion, Mills had told Nichols' counsel that approximately *three to four years earlier* [3] he had met with Culbertson in Washington, D.C. at the congressional offices of former Congressman James Traficant (D—Ohio) in the Rayburn House Office Building, where Culbertson was then serving as a legislative aide,[4] and that Culbertson showed Mills on a laptop computer "a video and still shots of a surveillance video taken of the Murrah Federal Building moments before and during the bombing of the building on April 19, 1995." Mills allegedly told Nichols' defense counsel that "you could see the Ryder truck in the video parked in front of the Murrah Building prior to the explosion and then, as the video progressed, you could see a small fire ball start from beneath the truck and gradually expand until the contents of the entire picture were engulfed in smoke and flame." After speaking with Mills, Nichols' defense counsel spoke with Culbertson by telephone on at least four occasions in mid-January 2004. According to Nichols' motion, Culbertson, in these conversations, (i) admitted to an association with Mills; (ii) neither admitted nor denied that he was in possession of the video or photographs

ment with plaintiffs. *See Arkansas Chronicle, et al. v. R. Mark Easley, et al.,* Civil Action No. 1:04cv110 (E.D.Va. Apr. 10, 2004) (Stipulation of Dismissal and Order). Finally, on April 30, 2004, an Agreed Order and Stipulation of Dismissal with Prejudice was entered dismissing this action as to defendants Fairfax County Board of Supervisors, the County of Fairfax, Virginia, and Suzanne G. Devlin, Acting Police Chief of Fairfax County. *See Arkansas Chronicle, et al. v. R. Mark Easley, et al.,* Civil Action No. 1:04cv110 (E.D.Va. Apr. 30, 2004) (Agreed Order and Stipulation of Dismissal).

3.  As described in detail *infra,* Mills later made clear that the first and last time he saw the alleged video and photographs was in August 1998.

4.  The motion further states that in 1996, Traficant was apparently Chairman of the Public Buildings Subcommittee of the House Transportation and Infrastructure Committee. According to Nichols' defense counsel, in that capacity, Traficant, with the assistance of Culbertson, conducted an inquiry into the Oklahoma City bombing.

described by Mills; and (iii) did not contest that Mills "had indeed seen what he claims to have seen." Nichols' defense counsel related that Culbertson professed concerns about having to identify the source from which he obtained any video, as well as concerns about "his own personal reputation and the contacts that he had developed in Washington should he assist the defense by providing a copy of the videotape." According to Nichols' motion, during a January 24, 2004 telephone conversation, Culbertson also expressed reluctance to produce any material voluntarily to Nichols' defense counsel "out of an apparent concern about what he believed would be the reaction of federal authorities." Nichols' motion also stated that on July 27, 2000, Culbertson had testified before the Commercial and Administrative Law Subcommittee of the House Judiciary Committee in his capacity as Director of the Center for Reform in support of a piece of pending legislation called the Fair Justice Act. Nichols' motion also noted that Culbertson in his testimony had stated that statements made by the Department of Justice that there were no photos or video of the explosions at the Murrah Building were apparently false, as he had discovered that some photos did indeed exist and were "known by members of the law enforcement community." In a portion of his prepared statement submitted to the Subcommittee, Culbertson referred to having "authored a report entitled 'Deadly Failures' which identified security and law enforcement failures [that] contributed [directly] to the Oklahoma City bombing" and further stated that after the release of this report, he had been approached by federal agents and officers who sought him out after reading the report to voice their support and, in some cases, to ask for help in contacting members of Congress "with respect to problems of corruption within their agency." From this, Nichols' defense counsel some-

how speculated that Culbertson might have obtained a copy of the video that Mills described after his testimony on July 27, 2000, "probably from some member of the federal law enforcement community." It is unclear from the record how or why Nichols' defense counsel reached this conclusion. Indeed, it appears to be nothing more than mere speculation and conjecture. Based on their conversations with Culbertson, Nichols' defense counsel also believed that "Culbertson is certainly concerned, if not outright scared, about the possibility of having to disclose the identity of the person from whom he received the video." Based on this information, Nichols' defense counsel requested that the Oklahoma state court issue both a subpoena duces tecum to Culbertson requiring production of the video and photographs and "an Emergency Order to preserve evidence, *to-wit:* any and all videos and photographs in the possession and or control of Mr. John Culbertson, whether they be in physical, electronic, digital or any other form that depict any and/or all activities involving the bombing of the Alfred P. Murrah Federal Building on April 19, 1995."

The Oklahoma state court refused to grant the emergency *ex parte* motion and instead conducted an *in camera* hearing on the motion on January 27, 2004. During this hearing, Nichols' defense counsel described the motion in general terms to the prosecution for the first time. This general description made no reference to the fact that Mills allegedly saw the pictures and video in question years earlier in the offices of a Congressman in Washington, D.C. on a government-owned laptop computer. Nichols' defense counsel did, however, make clear that they could not confirm that the photographs or video described by Mills actually existed. Indeed, it is clear that Culbertson never admitted to Nichols' defense counsel that he currently had these items in his possession.

Following the general description of the motion, the state prosecutor asked the Oklahoma state court to order Nichols' defense counsel "to disclose the name and the location of this person," further stating that "[w]e will get a search warrant and go find [the video], if it exists." The Oklahoma state court then asked Nichols' defense counsel whether or not they believed there was sufficient evidence to procure a search warrant to search for the alleged photographs and video. Nichols' defense counsel answered in the affirmative. The prosecutor then observed that "if they [defense counsel] have got a witness who says: I saw this image on this person's computer or on this person's whatever, that's enough to get a search warrant, and we can go get that computer." The Oklahoma state judge then noted "if you came to me with this information and asked me as a judge to issue a search warrant, I probably would do it." Yet, he also correctly recognized that he did not have jurisdiction or authority to issue a search warrant to be executed in another state and thus refrained from going "to the extent of ordering search warrants or anything like that." Instead, the Oklahoma state judge directed the State of Oklahoma to make a determination about what was "the most efficient, secure method to obtain this evidence" once they were aware of all the information Nichols' defense counsel had. The prosecutor immediately responded by announcing that they would "seek a search warrant." A discussion of some of the logistics of pursuing a search warrant ensued [5] and the Oklahoma state judge ordered Nichols' defense counsel to provide all the information they had on

this matter to the prosecutor so the prosecutor could conduct an investigation into the allegation of the existence of the video and photographs and, if appropriate, seek issuance of a search warrant. For reasons unclear in the record, there was essentially no discussion at the hearing concerning whether a subpoena duces tecum would have been the proper or more appropriate means by which to seek this potential evidence.

On January 28, 2004, Detective Mark Easley, assigned from the Oklahoma City Police Department to the Oklahoma County District Attorney's Office in the prosecution of Terry Nichols, interviewed Mills in Dallas, Texas. Easley tape-recorded this interview. According to the transcript of this tape recording, Mills told Detective Easley that in August 1998 Culbertson had shown him a "series of diagrams of the [Murrah] building blowing up" on a laptop computer in Congressman Traficant's office in the Rayburn building in Washington, D.C. According to Mills, these diagrams appeared to be photograph frames—the first frame showed the Murrah building with people walking around; the second frame showed "a glow" at the bottom of the building; the third frame showed "a ball that appear[ed] to be rising through the building; and the final frame showed a portion of the building that had collapsed." Significantly, the description Mills gave Detective Easley differed from the description set forth in Nichols' Emergency Motion in that Mills' account to Detective Easley did not include mention of a Ryder truck. During this conversation, Mills told Detective Easley that Culbertson would not reveal who had given him these photographs, although he ulti-

---

5. This discussion included an order from the Oklahoma state judge that none of the parties in the *Nichols* case tell Culbertson that there was "a search warrant coming." There was also discussion of how the chain of custody would be preserved in bringing all the items

seized pursuant to a search warrant for Culbertson's home to Oklahoma. Thus, the parties clearly recognized that a warrant would have to be obtained in another state, although Virginia was not specifically mentioned.

mately disclosed to Mills that he had received the photographs from an unnamed ATF agent. Culbertson apparently told Mills, however, that he "couldn't do anything with" the photographs because his source did not want his identity to be disclosed and that he suspected that these photographs were "being covered up by somebody." Mills then gave Culbertson's telephone number to Detective Easley and indicated that Culbertson still lived in the Washington, D.C. area.

Thereafter, Detective Easley traveled to Washington, D.C. and, on January 30, 2004, met with defendants Milefsky and Murphy, as well as Detective Robert A. Bond, Sergeant Bryan Holland and Second Lieutenant Bruce A. Guth, all of the Fairfax County Police Department. Deputy Commonwealth Attorney Raymond Morrough joined this meeting after it had commenced. At this meeting, Detective Easley stated that he had been assigned to the investigation of the 1995 Oklahoma City bombing and that he was currently assisting the Oklahoma State prosecution of Terry Nichols. Detective Easley also related that on January 27, 2004, Nichols' defense counsel had filed an Ex Parte Sealed Emergency Motion for Order to Preserve Evidence and for Subpoena Duces Tecum and supplied a copy of this motion. Detective Easley then telephoned Culbertson from Detective Murphy's office at the Homicide Division of the Fairfax County Police Department shortly after 12:00 p.m. This telephone conversation was recorded.

According to the transcript of the conversation prepared by Detective Easley, Culbertson told Detective Easley that due to "a variety of complex legal issues," such as "journalistic law" and "legislative privilege," he was not at liberty to divulge whether the photographs existed until receiving guidance from counsel. Culbertson did, however, inform Detective Easley that he had testified a few years earlier before the House Judiciary Contract Law Subcommittee and that he turned over "anything relevant" to what Detective Easley was asking for to that subcommittee. Culbertson also told Detective Easley that he never possessed, nor had he ever seen, a video of the Oklahoma City bombing with the Ryder truck, as Nichols' defense counsel had described. As for the still photographs Mills described to Detective Easley, Culbertson stated that those photographs were not on his computer, but rather were on a computer in the House Office Building that did not belong to him. According to Culbertson, those still photographs were of various personnel and ATF agents around the Murrah building and they were turned over to the House subcommittee as well. Culbertson also mentioned a photograph showing a "ball of flame on what appears to be the corner of the building," but that there was no way to know whether the photograph was valid. He again reiterated that these photographs were all on a computer in the House and would probably "be in a Congressional collection that's owned by the member."[6] At the end of the conversa-

---

**6.** A fair reading of the tape-recorded conversation between Detective Easley and Culbertson, therefore, warrants the following conclusions: (i) Culbertson told Detective Easley he was never in possession of any photographs of the Oklahoma City bombing showing the Ryder truck (This was corroborated by Mills, who told Detective Easley that he never told Nichols' defense counsel that Culbertson showed him images with the Ryder truck in

them.); (ii) Culbertson did not admit or deny that he was currently in possession of images of the Murrah building moments immediately before, during, and after the bombing; (iii) any images Culbertson showed Mills were viewed on a government laptop computer that did not belong to Culbertson; and (iv) any images he did have had been turned over to a congressional subcommittee and were in the public domain.

tion, Detective Easley asked Culbertson to consider sitting down with the lawyers from both sides of the case to speak with them about the situation. Culbertson told Detective Easley that he needed to make a telephone call first and would call him back. Thereafter, Culbertson called Detective Easley back and informed him that he would not be able to meet with the attorneys in the *Nichols* case, citing journalistic privilege.[7] Culbertson also told Detective Easley that he had legislative privilege because he formerly worked for a Congressman. Finally, Culbertson explained that he was a consultant to the Philippines working for the Department of Justice and that for some unexplained reason, this somehow provided him with an additional form of privilege.

Detective Easley then requested assistance from the Homicide Division of the Fairfax County Police Department in obtaining and executing a search warrant for Culbertson's home. In their affidavits, Detectives Murphy and Milefsky state that Detective Easley played the "pertinent portion"[8] of his telephone conversation with Culbertson for them and defendants now say, without explanation, that they "determined that Culbertson was uncooperative and evasive and that it was very likely that he was in possession of the video-tape(s) and photograph(s)." While Detective Easley prepared the affidavit in support of the search warrant, Detective Milefsky assisted him by filling out the facial requirements of the warrant for Culbertson's home. Detective Easley's affidavit in support of the search warrant stated, in relevant part, (1) that Easley had been specially assigned to the Oklahoma County District Attorney's Office for the state

prosecution of Terry Nichols; (2) that on April 19, 1995, the Murrah Federal Building in Oklahoma City was destroyed by a large truck bomb; (3) that on January 27, 2004, it was brought to the attention of prosecutors during an *in camera* hearing that Culbertson may have evidence of that crime that had not yet come to the attention of federal · or state prosecutors through the Emergency Motion filed by Nichols' defense counsel; (4) that on January 28, 2004, Easley went to Dallas and interviewed Mills; (5) that Mills stated Culbertson showed him a video and possibly three still photographs on Culbertson's laptop computer on August 26, 1998; (6) that Mills advised Easley that the video consisted of images that occurred after the bombing, the first still photo was of the Murrah Building in pristine condition before the bombing, the second photo showed a small glow at the bottom of the building, and the third photo showed a ball of fire rising from the building and the building falling; (7) that Mills stated that Culbertson said he received the video and still photographs from an ATF agent; (8) that Mills had recently contacted Culbertson to tell him that Nichols' defense attorneys had learned about his "secret video and pictures" and that, in response, Culbertson stated that it was going to be a "tight rope for [him] to walk;"[9] (9) that Culbertson told Detective Easley on January 30, 2004 that he had shown the alleged pictures to Mills and had turned a copy of them over to the House Judiciary Committee "several years ago;" and (10) that, in response to Detective Easley asking him whether he still had a copy of the video and pictures, Culbertson stated that he

---

7. According to Detective Easley, Culbertson told him that he was the producer of a television show called "African Lifestyles."

8. There is no indication in the record as to which portion of the conversation constitutes

the "pertinent portion" in the view of Detectives Murphy and Milefsky.

9. According to Detective Easley's affidavit, Mills apparently took this statement to mean that "Culbertson still had the information."

could not divulge that information. Finally, Easley stated in his affidavit that in his experience "a person in possession of items of this magnitude and uniqueness is unlikely to dispose of or destroy the information. Instead, he is more likely to leave it on the computer or copy it to a disc of some sort or both." [10]

Omitted from Detective Easley's affidavit were the following facts: (i) that Culbertson never admitted to having current possession of the items in question; (ii) that Culbertson had told Detective Easley that any photographs he showed Mills in 1998 in Washington, D.C. were shown in the offices of a former Congressman on a government computer that did not belong to him; (iii) that Culbertson had turned these materials over to the congressional subcommittee before which Culbertson had testified years earlier; [11] and (iv) that these photographs would probably "be in a Congressional collection that's owned by the member."

Based on the Easley affidavit, a Virginia magistrate [12] issued a search warrant for Culbertson's home, which described the things to be searched for as follows:

Any and all computer equipment, hard disk drives, compact disks, floppy disks, magnetic tapes or other magnetic or optical media capable of storing information in an electronic, magnetic or optical format. This information may include, but is not limited to letters, correspondence, memoranda, journals, electronic mail, image files, database files, deleted files, partial files or other types of files found in the media or computer.

This warrant issued at approximately 3:30 p.m. on January 30, 2004. Twenty minutes later, at 3:50 p.m., Detectives Easley, Murphy, Milefsky, Ken Haynes, Sergeant Holland, and Officer Machosky entered Culbertson's home and executed the search warrant. When the six persons entered Culbertson's home, Culbertson objected, advising them that a search would implicate "First Amendment issues," but did not elaborate further. The search consumed more than three and one half hours, ending finally at approximately 7:35 p.m. Detective Murphy recorded and logged each item seized. According to Detective Murphy's inventory log, the search of Culbertson's home resulted in the seizure of:

- Eight (8) desktop computers;
- Two (2) laptop computers;
- Four hundred and fifty-four (454) 3.5–inch diskettes;
- One hundred and seventy (170) CD–Roms;
- Eight (8) mini-CD-Roms;
- Four (4) zip-disks;
- One (1) hard-drive;
- Fourteen (14) VHS tapes;

10. There is no indication in the record that the tape-recorded conversation between Detective Easley and Culbertson was ever played for the Virginia magistrate who ultimately issued the search warrant for Culbertson's home.

11. While Detective Easley's affidavit does state that Culbertson had turned over a copy of the photographs "to the House Judiciary Committee several years ago," it does not state that Culbertson had testified before a congressional subcommittee on a matter related to the Oklahoma City bombing or that the photographs were submitted as part of his testimony. As a result, those photographs were likely available in the public domain.

12. In Virginia, magistrates need not be members of the bar or have any legal training prior to their appointment. See Va.Code § 19.2–37 (listing restrictions on who may be appointed as a magistrate); Va.Code § 19.2–38.1 ("Every magistrate appointed to an original term commencing on or after July 1, 1995, shall be required to have a bachelor's degree from an accredited institution of higher learning or equivalent experience.").

- Four (4) notebook binders containing Culbertson's notes relating to the 1995 Oklahoma City bombing; and
- One (1) manila folder with documents inside.

In his April 27, 2004 declaration, Culbertson states some of the items seized from his home during the January 30, 2004 search included his notes for stories and paper documents, which contained no video or photographic images and were unrelated to the 1995 Oklahoma City bombing. These notes and documents were contained in a manila folder and a computer case, listed as items AC and AR in the Inventory of Seized Property. Culbertson also declares that the four notebook binders seized from his home contained his notes relating to the 1995 Oklahoma City bombing, and that these notes also did not contain or concern any video or photographic images of the Murrah Building. In addition, the record reflects that only one of the computers seized belonged to the Arkansas Chronicle and that this computer had no information on it when seized. The record also reflects that one of the computers seized belonged to Culbertson's minor child, and also contained no pictures or videos of the Murrah building. The remaining computers and related items belonged to Culbertson.

After completion of the search, the seized property was stored and secured at the Homicide Division of the Criminal Investigations Bureau of the Fairfax County Police Department. On Monday, February 2, 2004, Detectives Murphy and Milefsky removed the seized items from the Homicide Division and prepared them for shipment. They shipped a total of eight (8) boxes via United Parcel Service to the Oklahoma City Police Department in care of Detective Easley. On Wednesday, February 4, 2004, Detective Milefsky contacted Detective Easley and confirmed that the eight boxes had been received and were accounted for.

On February 3, 2004, plaintiffs filed in the District Court of Oklahoma County a Motion to Quash Search Warrant Obtained by State of Oklahoma and Motion to Suppress Property Seized as a Result of Said Search Warrant and Motion for Return of All Property Illegally Seized. That same day, plaintiffs filed the instant federal suit in this district, asserting claims that the search and seizure of items from Culbertson's home and home office violated the First and Fourth Amendments. And the next day, plaintiffs also filed here an Emergency Motion for a Temporary Restraining Order, which motion was set for a hearing on the afternoon of February 5, 2004. As a result of that hearing, this Court issued a Temporary Restraining Order ("TRO") dated February 5, 2004, ordering the prompt return of the seized property to Culbertson and that Culbertson review these materials and produce any photographs or videos of the Murrah Federal Building at or immediately prior to the bombing.

On February 6, 2004, the Oklahoma state court entered an order in the *Nichols* case ordering the Oklahoma City Police Department to maintain custody of the materials seized from Culbertson's home. This order set a hearing on the Motion to Quash filed by plaintiffs in Oklahoma for 1:00 p.m., February 10, 2004. This hearing took place on February 10 and 11, 2004, and the Oklahoma state court took the motion under advisement, but also ordered Culbertson to travel to Oklahoma City and review the materials and, if nothing were found in the materials that might be evidence of the Murrah bombing, the Oklahoma City Police Department was to release the materials to Culbertson.

On February 10, 2004, Oklahoma City, not yet a party to this case, filed an appli-

cation to modify or vacate the TRO that issued on February 5, 2004. This Court scheduled a February 12, 2004 hearing on this application, as well as on the question whether a show cause order should issue concerning defendants' noncompliance with the TRO. Following this hearing, this Court, by Order dated February 12, 2004, denied in part and deferred in part Oklahoma City's application to modify or vacate the TRO. *See Arkansas Chronicle, et al. v. R. Mark Easley, et al.*, Civil Action No. 1:04cv110 (E.D.Va. Feb. 12, 2004) (Order). The application was denied insofar as it sought modification of the TRO and it was otherwise deferred pending the parties' efforts to reach a settlement and resolution of the issues raised by the Complaint and the application. Plaintiffs' motion for an order to show cause was also deferred. The parties subsequently reached an agreement whereby Culbertson traveled to Oklahoma City to review the materials seized from his home for any photographs or video of the Murrah Federal Building at the time of, or immediately before, or after, the April 1995 bombing.[13]

In the meantime, on February 18, 2004, after denying a request by Culbertson and the Arkansas Chronicle to withdraw their motion, the Oklahoma state court denied their Motion to Quash a Search Warrant Obtained by the State of Oklahoma and Motion to Suppress Property Seized as a Result of Said Search Warrant and granted the Motion for Return of All Property Illegally Seized on February 3, 2004, in accordance with the procedure already agreed to by the parties for the return of the materials seized from Culbertson's home. In making its ruling, the Oklahoma state court observed that there were "absolutely no legal flaws" in "the entire procedure that has taken place involving the search warrant that was issued by the magistrate in Virginia."

On April 8, 2004, Oklahoma City filed a motion to intervene in this case as a party defendant, which motion was granted on April 12, 2004. *See Arkansas Chronicle, et al. v. R. Mark Easley, et al.*, Civil Action No. 1:04cv110 (E.D.Va. Apr. 8, 2004) (Order). On April 10, 2004, a Journal Entry of Partial Judgment for Plaintiffs against Oklahoma City in the sum of $60,000, plus interest, was filed, along with a stipulation of dismissal and order dismissing Detective Easley and Oklahoma City from the case with prejudice pursuant to Rule 41(a), Fed.R.Civ.P. *See Arkansas Chronicle, et al. v. R. Mark Easley, et al.*, Civil Action No. 1:04cv110 (E.D.Va. Apr. 10, 2004) (Stipulation of Dismissal and Order). On April 30, 2004, an Agreed Order and Stipulation of Dismissal with Prejudice dismissing this action as to defendants Fairfax County Board of Supervisors, the County of Fairfax, Virginia, and Suzanne G. Devlin, was filed and granted. *See Arkansas Chronicle, et al. v. R. Mark Easley, et al.*, Civil Action No. 1:04cv110 (E.D.Va. Apr. 30, 2004) (Agreed Order and Stipulation of Dismissal). As already noted, therefore, Fairfax County Detectives Murphy and Milefsky are the only remaining defendants in this case.

Plaintiffs' Amended Complaint consists of three counts. Count I alleges a violation of the First Amendment. Plaintiffs allege that defendants designed a common plan or scheme to deny plaintiffs their First Amendment rights by acting in concert with each other to devise a false, misleading and fraudulent application for a search warrant, obtaining the issuance of same, and thereafter illegally seizing and denying access by plaintiffs to their physi-

---

**13.** According to plaintiffs' pleadings, undisputed on this point, no such photographs or video were ever found in the seized materials.

cal and intellectual property, thereby destroying plaintiffs' ability to publish. Count II alleges a violation of the Fourth Amendment based on the search warrant obtained to search Culbertson's home. Finally, Count III, brought solely on behalf of Culbertson, alleges a violation of 42 U.S.C. § 1983 for defendants' common plan or scheme to deny Culbertson his First and Fourth Amendment rights. It should be noted, however, that despite the separate First Amendment claim alleged in the Amended Complaint, plaintiffs in both their motion for summary judgment and their response to defendants' motion for summary judgment appear to have abandoned the claim concerning a separate First Amendment violation, and contend instead that because the Fourth Amendment search had First Amendment implications, the Fourth Amendment's requirements in such circumstances must be applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

## II.

■■■■ The threshold jurisdictional question is whether, as defendants contend, consideration of plaintiffs' constitutional claims brought under 42 U.S.C. § 1983 is barred by the *Rooker–Feldman* doctrine.[14] The *Rooker–Feldman* doctrine "prohibits the United States District Courts, with the exception of habeas corpus actions, from 'sit[ting] in direct review of state court decisions.'" *Jordahl v. Democratic Party of Virginia*, 122 F.3d 192, 199 (4th Cir.1997) (quoting *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). Put another way, the doctrine prevents "a party losing in state

court ... from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). This prohibition "extends not only to issues actually decided by a state court but also to those inextricably intertwined with questions ruled upon by a state court." *Barefoot v. City of Wilmington*, 306 F.3d 113, 120 (4th Cir. 2002) (internal quotation marks omitted). As the relevant precedent makes clear, "[a] federal claim is 'inextricably intertwined' with a state court decision if success on the federal claim depends upon a determination that the state court wrongly decided the issues before it.'" *Id.* (quoting *Feldman*, 460 U.S. at 482 n. 16, 103 S.Ct. 1303). In addition, the *Rooker–Feldman* doctrine also "bars issues that *could* have been raised in the state court proceeding." *Id.* The sole court with jurisdiction to review decisions of state courts is the United States Supreme Court. *Feldman*, 460 U.S. at 486, 103 S.Ct. 1303. Finally, it is important to note that the *Rooker–Feldman* doctrine "precludes not only review of adjudications of the state's highest court, but also the decisions of its lower courts." *Id.*

■■■■ Defendants contend that the *Rooker–Feldman* doctrine bars a federal court from now considering the Fourth Amendment issues in this case because plaintiffs here presented these issues to the Oklahoma state court in their Motion to Quash a Search Warrant Obtained by the State of Oklahoma, to Suppress Property Seized as

---

**14.** *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Friedman's, Inc. v. Dunlap*, 290 F.3d

191, 196 (4th Cir.2002) ("Because the *Rooker–Feldman* doctrine is jurisdictional, we are obliged to address it before proceeding further in our analysis.").

a Result of Said Search Warrant and Motion for Return of All Property Illegally Seized on February 3, 2004, and that the Oklahoma state court ruled on the motion, finding that there were "absolutely no legal flaws" in "the entire procedure that has taken place involving the search warrant that was issued by the magistrate in Virginia." [15] Plaintiffs, for their part, argue that defendants have mischaracterized the Oklahoma state court's ruling. In their view, the *Rooker–Feldman* doctrine has no application to this case because the Oklahoma state court did not actually decide the constitutional issues raised here, but instead made a finding only with respect to the issue of whether a search warrant, as opposed to a subpoena *duces tecum*, was an appropriate vehicle for obtaining the video and photographs allegedly in Culbertson's possession.

At the outset, the Oklahoma state judge's refusal to allow plaintiffs to withdraw their motion is puzzling, given that plaintiffs were not parties to that criminal action and had no standing to suppress any evidence used in that criminal proceeding. Nor, it seems clear, could the Oklahoma state court quash a search war-

---

**15.** The full text of the Oklahoma state court's February 18, 2004 oral ruling is as follows:

All right. The Court has already given a pretty good preview last week on the Fourth Amendment issues that have been raised. And I have stated it, I think in response to some argument made by Ms. Elliott last week, and I'll repeat, that the Court, in reviewing the entire procedure that has taken place involving the search warrant that was issued by the magistrate in Virginia, the Court finds absolutely no legal flaws in that process. [The Oklahoma state court appears to be referring here to a February 11, 2004 exchange between Oklahoma prosecutor Sandra Elliott and the court. Ms. Elliott asked the Oklahoma state judge whether he would have signed and issued a search warrant to search Culbertson's home and whether there was probable cause. The judge answered in the affirmative.]

It was a process—and I think [Nichols' defense counsel] Mr. Earnest has really described it in as much detail and—as we've heard, and that is that there—that Mr. Culbertson was approached from every direction; by Mr. Earnest in every way that Mr. Earnest knew to finesse this difficult situation of knowing about potential evidence.

Sergeant Easley—then after the hearing we had in Oklahoma City on the 27th, Sergeant Easley took charge of it, and approached it from a different standpoint, from law enforcement. And Sergeant Easley, I am convinced from the evidence, made—took every approach he could, just as Mr. Earnest had done as a defense lawyer, Sergeant Easley took every approach he could with Mr. Culbertson to obtain cooperation in this matter. And frankly, this Court is absolutely convinced that there was—there was no—there was no alternative left but to proceed with a search warrant.

That's the way it ought to be. A search warrant ought to be the last resort. But the Court is convinced that it was an appropriate resort, an appropriate action taken by Sergeant Easley on behalf of the State of Oklahoma, and frankly, without any objection from counsel for Mr. Nichols. This was discussed in Oklahoma City at that hearing, and we all knew that that would be the last resort, and it was, and it was appropriate. Because there was no other avenue of cooperation, and this was a matter of great importance to both sides in this case. So the motion to quash is overruled, denied. The motion to suppress: Overruled, denied. The motion for return of the property is granted in accordance with the order that this Court entered last Thursday, that has been also—last Wednesday; I entered the order last Wednesday. The United States District Judge in Virginia was advised of the procedure, asked counsel up there to come to some conclusion.

They agreed on the procedure. And this procedure appears to be going well, and will continue hopefully on Monday. So the motion to return the property is granted in accordance with the order that this Court has entered and the review process that has begun.

rant issued in Virginia for a search in Virginia that had already occurred.[16] The Oklahoma state court did not address any of these jurisdictional flaws and in the end it appears that the Oklahoma state judge did not allow plaintiffs to withdraw their motion because he "wished to complete this inquiry" and dispose of any questions concerning the legality of the Virginia search and seizure he had encouraged, questions he knew had been squarely and properly raised between the proper parties two weeks earlier by the filing of this federal action.

■ In any event, the Oklahoma state court's intentions and motivations, whatever they may have been, are not dispositive of the *Rooker–Feldman* question. Nor is it dispositive that the Oklahoma state court neither mentioned nor analyzed the important questions underlying its remarks about the search, including (i) whether it had jurisdiction, *i.e.*, power to adjudicate questions concerning the search, and (ii) whether there was probable cause to support the search and seizure because the information offered in support of the warrant was stale, inaccurate and speculative. The absence of any mention or analysis of these central issues is not dispositive because it is clear that "[i]f a state court considers and rejects a consti-

tutional claim on the merits, a paucity of explicit analysis in the court's opinion will not strip the holding of its validity for purposes of *Rooker–Feldman's* jurisdictional bar." *Gulla v. North Strabane Township*, 146 F.3d 168, 172 (3d Cir. 1998).[17]

■ Here it appears from the Oklahoma state court's language that it believed it was rejecting plaintiffs' constitutional claims on the merits. But this, too, is not dispositive and does not end the analysis for an exception to the *Rooker–Feldman* doctrine, pertinent here, is that it does not apply where it is pellucidly clear that there is a total lack or want of subject matter jurisdiction for a state court judgment; such judgments are void *ab initio* and do not warrant the benefit of the *Rooker–Feldman* doctrine. *See, e.g., In re James*, 940 F.2d 46, 52 (3d Cir.1991).[18] Although this principle has thus far found judicial expression only in bankruptcy cases,[19] there is no reason in principle it should not apply in other contexts, provided it is one of those rare cases where the want of jurisdiction is glaringly apparent. In such circumstances, the legal context should not matter because void judgments cannot be the basis for *Rooker–Feldman* deference.[20]

---

16. In addition, while it appears the Oklahoma state court may have had jurisdiction over plaintiffs' motion for return of the seized property as that property was by then physically in Oklahoma, the Oklahoma state judge in his ruling recognized that the parties had already agreed upon a review and return process, which had already commenced. As a result, that issue had become moot.

17. It is unclear on this record whether the Oklahoma state court entered an order reflecting its oral ruling. No such order has been produced in this record.

18. *But see In re Ferren*, 203 F.3d 559, 560 (8th Cir.2000) (declining to create a void *ab initio* exception to the *Rooker–Feldman* doctrine).

19. *See Schmitt v. Schmitt*, 324 F.3d 484, 487 (7th Cir.2003) (noting that bankruptcy cases are "apparently the only situation in which [the void *ab initio* exception] has been applied").

20. Of course, the void *ab initio* status of a state court judgment may be more readily apparent in bankruptcy cases, where federal jurisdiction is exclusive rather than concurrent. But even in contexts where state and federal courts enjoy concurrent jurisdiction, there may, of course, be instances where a state court's lack of subject matter jurisdiction is so glaringly obvious that the void *ab initio* exception to the *Rooker–Feldman* doctrine should apply.

The unusual circumstances of this case warrant application of the void *ab initio* exception for it is unmistakably clear that the Oklahoma state court had no jurisdiction to quash a Virginia search warrant that had already been executed in Virginia. Equally clear was the absence of any Oklahoma state court jurisdiction over plaintiffs' motion to suppress. A non-party to a criminal prosecution has no standing to suppress evidence in a criminal case. *See United States v. Dorfman*, 690 F.2d 1217, 1225 (7th Cir.1982) ("[The] suppression remedy ... can only be invoked in a criminal trial, by the victim of the illegality, to prevent the use of the tainted evidence against him."). Just as only a defendant whose rights were violated by a search has standing to object to the admission of evidence from the search on Fourth Amendment grounds,[21] a third party who is not a defendant has no standing to argue for the suppression of evidence in a criminal trial under the Fourth Amendment.[22] Under no remotely plausible circumstance was the evidence seized from Culbertson's home going to be used against Culbertson or the Arkansas Chronicle in the Oklahoma state prosecution of Terry Nichols. Thus, even though Culbertson and the Arkansas Chronicle were allegedly the victims of illegality, they could not move to suppress the evidence in Nichols' trial on the basis of the Fourth Amendment. *See Dorfman*, 690 F.2d at 1226; *United States v. Kember*, 648 F.2d 1354, 1367 (D.C.Cir.1980). As a result, the Oklahoma state court had no jurisdiction to rule on the Fourth Amendment issues related to the search warrant in this case. Indeed, no arguable basis for the Oklahoma state court's jurisdiction existed.[23] As a result, the *Rooker–Feldman* doctrine does not bar consideration of those issues here.

This conclusion finds support in the principal policy that animates the *Rooker–Feldman* doctrine. That central policy is a concern for the principles of federalism. The doctrine rests on the presumption that completed state court proceedings can and have correctly resolved federal questions properly before those state courts. Importantly, however, there is a marked difference between respecting a state court decision on federal questions properly before that state court and sanctioning a

---

**21.** *See Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.").

**22.** This is evident from even a cursory examination of the rationale behind the exclusionary rule. As the Supreme Court has made clear, the purpose of the exclusionary rule is not to redress the injury to the privacy of the victim unlawfully searched; "[i]nstead, the purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the Fourth Amendment guarantee against unreasonable searches and seizures." *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Based on

this principle, the Supreme Court has stated in no uncertain terms that

> standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search. This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search.

*United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

**23.** While it is arguable that the Oklahoma state court had power over the seized materials that had been sent to Oklahoma City and their return, this issue, as the Oklahoma state court recognized, had already been resolved by agreement of the parties.

clear usurpation of power by a state court that seeks to decide federal questions it has no power to decide. In this case, the Oklahoma state court's jurisdiction was so glaringly lacking that allowing its judgment to bar federal jurisdiction here would be an affront, not an aid, to federalism. In the final analysis, federalism is a two-way street founded upon *mutual* respect between federal and state courts. While federal courts must recognize both the power and the ability of state courts to decide federal questions, state courts must also recognize that they cannot create for themselves jurisdiction to reach federal questions not properly before them. Where, as here, the absence of state court jurisdiction is pellucidly clear and the state court judgment so obviously void *ab initio*, the *Rooker–Feldman* doctrine does not operate to prevent a federal court from addressing federal questions properly before it.[24] Given that the *Rooker–Feldman* doctrine does not apply in this case, there is no bar to consideration of plaintiffs' constitutional claims here and the merits of those claims must now be addressed and decided.

### III.

██ Plaintiffs' Fourth Amendment claim is brought pursuant to 42 U.S.C. § 1983. To establish personal liability in a § 1983 action, a plaintiff must show (i) that he was deprived of a right secured by the Constitution or laws of the United States, and (ii) that the defendant acted under color of state law. *Conner v. Donnelly,* 42

F.3d 220, 223 (4th Cir.1994). The "under color of state law" portion of a § 1983 claim requires that " 'the conduct allegedly causing the deprivation of [the plaintiff's rights] be fairly attributable to the State.' " *Id.* (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). Because it is clear that "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law," there is no doubt that defendants Murphy and Milefsky—both detectives in the Fairfax County Police Department—were acting under color of state law when they participated in procuring and executing a search warrant on Culbertson's home in Virginia. It remains to be seen whether plaintiffs can show they were deprived of a right guaranteed by the Constitution or laws of the United States.

The thrust of plaintiffs' motion for summary judgment relates to their claim of Fourth Amendment violations with respect to the search warrant issued and executed on Culbertson's home, which included his home-office for the Arkansas Chronicle. Specifically, plaintiffs challenge the search warrant for Culbertson's home and home-office on three bases. First, they argue that the search warrant was invalid because it was overbroad in violation of the Fourth Amendment's particularity requirement. Second, plaintiffs contend that the information upon which the search warrant was based was stale, incomplete and insufficient to support a finding of probable

---

**24.** A hypothetical helps illustrate this point. Had the Oklahoma state court reached the Fourth Amendment issues related to the search warrant issued and executed in Virginia *sua sponte,* in the absence of a motion by Culbertson and the Arkansas Chronicle, the total want of jurisdiction would be even more apparent. To allow the *Rooker–Feldman* doctrine to apply in such a situation would be nonsensical; it would essentially allow a state court to issue advisory opinions on federal questions binding on federal courts. The fact that Culbertson and the Arkansas Chronicle filed the motion in the mistaken belief (i) that the Oklahoma state court had jurisdiction to quash a Virginia search warrant and (ii) that they had standing to bring a motion to suppress in the *Nichols* case does not alter this conclusion.

cause. Finally, plaintiffs argue that probable cause was also lacking because there did not exist a fair probability that evidence of a crime would be found in Culbertson's home in January 2004 given that (i) the alleged evidence was seen by Mills only once in August 1998 in a Congressman's office at the Rayburn House Office building in Washington, D.C. on a laptop computer that belonged to the government and (ii) according to Detective Easley's own affidavit, Mills himself stated that he could not remember whether he had seen photographs with the Ryder truck in front of the Murrah building, as described by Nichols' defense team in their Emergency Motion, and indeed denied ever having told Nichols' defense attorneys that he had seen such photographs. As already noted, plaintiffs argue that due to Culbertson's status as a journalist for the Arkansas Chronicle, Fourth Amendment preconditions for the issuance of a search warrant must be applied with particular exactitude when First Amendment interests could be endangered.[25] *See Zurcher,* 436 U.S. at 564, 98 S.Ct. 1970. Defendants, for their part, argue that probable cause existed, that the search was valid, and that the scope of the search was properly limited to the nature of the items sought.

Given the dormant status of the Arkansas Chronicle at the time of the search of Culbertson's home, it is not appropriate to apply the Fourth Amendment's requirements with "scrupulous exactitude." *Zurcher,* 436 U.S. at 564, 98 S.Ct. 1970. In any event, exacting scrutiny is unnecessary for even a routine application of clearly established Fourth Amendment principles is sufficient to disclose Fourth Amendment violations on this record.

## A. Overbreadth

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Amendment's particularity requirement is designed to prevent "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). As previously noted, the search warrant at issue here authorized the seizure of:

Any and all computer equipment, hard disk drives, compact disks, floppy disks, magnetic tapes or other magnetic or optical media capable of storing information in an electronic, magnetic or optical format. This information may include, but is not limited to letters, correspondence, memoranda, journals, electronic mail, image files, database files, deleted files, partial files or other types of files found in the media or computer.

Plaintiffs argue that the search warrant issued to search Culbertson's home was unconstitutionally overbroad and failed to meet the Fourth Amendment's particularity requirement by permitting the wholesale search and seizure of voluminous private, personal and confidential materials

---

**25.** To the extent that plaintiffs continue to pursue their claim for a separate First Amendment violation, defendants are entitled to summary judgment on such a claim. Plaintiffs have presented no evidence that Detectives Murphy or Milefsky knew Culbertson was a member of the press, that his home was also an office for a publication, or that these officers intended to halt, disrupt, or delay publication of any kind. The only evidence in the record is Culbertson's testimony that when officers entered his home on January 30, 2004, he advised them that there were "First Amendment issues" implicated, but did not elaborate any further. Moreover, because the Arkansas Chronicle was admittedly a "dormant company" at the time of the search, it does not appear that the company was actively publishing articles at the time of the search.

that were unrelated to the Oklahoma City bombing or could not possibly contain the video or three still photographs referenced in Detective Easley's affidavit.

Detective Easley's affidavit, which was incorporated by reference and attached to the search warrant, makes clear that the search warrant was sought in order to obtain a video and three still photographs of the Oklahoma City bombing that Mills allegedly viewed on a laptop computer in Culbertson's possession in Washington, D.C. in August 1998. The warrant, however, authorized the search and seizure of virtually every piece of computer equipment, computer file or document in Culbertson's home, including the seizure of a computer that belonged to Culbertson's minor child. To the extent that the warrant provided any guidance to the officers executing it, it authorized seizure of every piece of computer equipment and every type of document that might be stored on such equipment. In these circumstances, such a warrant essentially amounted to a general warrant giving police the authority to rummage through every single computer file and document with no limitations on which documents could be seized. *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir.1995) (finding that warrant which sought all business records, computer hardware and software, files, ledgers, and invoices lacked particularity because it contained no limitations on which documents within each category of documents could be seized). While it is true that photographs and other images contained in computer files may be easily transferred, it remains the case that the search warrant authorized the seizure of items that could not plausibly contain photographic material, such as letters, correspondence, memoranda, and journals. Clearly, a search warrant that allows the police to seize letters, correspondence, memoranda, and journals in order to find a video and three still photographs is patently overbroad.

Indeed, as the inventory of the items seized reflects, the officers executing the search seized four notebook binders and a manila folder containing documents. These fruits of the search confirm the excessive breadth of the warrant, as does the seizure of one computer belonging to Culbertson's minor child.

Defendants' misplaced reliance on various child pornography and related cases finding the seizure of computers and associated devices constitutional does not alter this conclusion. *See, e.g., Davis v. Gracey*, 111 F.3d 1472, 1480 (10th Cir.1997); *United States v. Kimbrough*, 69 F.3d 723, 727 (5th Cir.1995); *United States v. Sassani*, 139 F.3d 895 (Table), 1998 WL 89875 at *6 (4th Cir. Mar.4, 1998) (unpublished). As a review of these cases makes clear, courts have found search warrants allowing seizure of a computer and all its associated printing, storage, and viewing devices constitutional in child pornography cases because these items "not only may contain evidence of distribution of child pornography, but are also the instrumentalities of the crime." *Sassani*, 1998 WL 89875 at *6. In stark contrast, Culbertson's computers and other computer-related items whose seizure was authorized by the search warrant are not alleged to be the instrumentalities of any crime. Indeed, these items were nothing more than a journalist's personal and work-related tools. As such, the search warrant was clearly overbroad in violation of the Fourth Amendment.

**B. Staleness and Lack of Probable Cause**

As the Fourth Amendment makes clear "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation ...." U.S. Const. amend. IV. The Supreme Court has interpreted this language to mean that a magistrate issuing a search warrant must "make a practical, common-sense decision whether, given all

the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The duty of a reviewing court "is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. 2317. More specifically, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his actions cannot be a mere ratification of the bare conclusions of others." *Id.* at 239, 103 S.Ct. 2317. Thus, "[i]n order to ensure that such an abdication of the magistrate's duty does not occur," courts must "conscientiously review the sufficiency of affidavits on which warrants are issued." *Id.*

■ As the facts of this case make clear, Culbertson was never suspected of any criminal activity by Detective Easley. It is equally clear, however, that "[i]n determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor,* 996 F.2d 1578, 1582 (4th Cir.1993) (citing *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 & n. 6, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)). In this regard, information used to support a finding of probable cause must be sufficiently fresh to warrant a belief that evidence of a crime will be found in the area to be searched. *See United States v. McCall,* 740 F.2d 1331, 1335–36 (4th Cir.1984). Time, therefore,

"is a crucial element of probable cause." *Id.* And, "[a] valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *Id.* (citing *Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 77 L.Ed. 260 (1932)). Put another way, probable cause cannot be based on stale information; there must exist probable cause that evidence of criminal activity will exist at the time of the search.

■ In the case at bar, it is evident that such probable cause did not exist. Mills told Detective Easley that he had seen the alleged video and photographs of the Oklahoma City bombing on only one occasion *six years* before the search warrant issued. While "the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit,"[26] this is certainly an important factor in the probable cause analysis, particularly when no ongoing criminal activity is alleged to support the issuance of a search warrant. *See, e.g., Molina ex rel. Molina v. Cooper,* 325 F.3d 963, 968 (7th Cir.2003) (tip from informant regarding suspected drug dealer stale where informant's involvement with alleged drug dealer ended more than two years before the tip was used to obtain a search warrant; as a result this tip could not be used to support a finding of probable cause). Still, it is true that a court "must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *McCall,* 740 F.2d at 1336. In cases unlike the instant case, where the unlawful activity alleged is of an ongoing, protracted, and continuous nature, the re-

---

26. *McCall,* 740 F.2d at 1336 (quoting *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972)).

cency of the information used to support a search warrant is "less crucial." *See United States v. Farmer*, 370 F.3d 435, 439 (4th Cir.2004).[27] By the same token, where an affidavit "recites a mere isolated violation," an implication "that probable cause dwindles rather quickly with the passage of time" is warranted. *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir.1972) (cited with approval by the Fourth Circuit in *Farmer*, 370 F.3d at 439).

Here, of course, Culbertson is not alleged to have engaged in any unlawful activity. Nonetheless, the principal basis for the search warrant—Mills' alleged viewing of a video and possibly three still photographs six years earlier—was an isolated incident that occurred only once, not an "activity of a protracted and continuous nature." *Johnson*, 461 F.2d at 287. Therefore, the passage of six years from the isolated incident supporting a search warrant for Culbertson's home to the issuance and execution of that warrant is of great significance in the probable cause calculus. An isolated incident occurring six years earlier is simply insufficient to support a finding of present probable cause.

Moreover, the nature of the property sought by the search warrant also did not support a finding of probable cause. While it is true that photographs and video, particularly those preserved in computer format, are not perishable items, it is also true that these items are easily transferable. In this respect, it is important to note that the freshest information that Detective Easley had was that Culbertson, who never admitted current possession of the video or photographs, had turned over whatever images he had of the Oklahoma

City bombing to a House Subcommittee and stated that he never had images of a Ryder truck in front of the Murrah Federal building at the time of the explosion. The Emergency Motion filed by Nichols' defense team itself corroborates that Culbertson testified before a House Subcommittee and submitted photographs related to the Oklahoma City bombing to that Subcommittee along with his written testimony. Given this information, it was not reasonable to assume that photographs that had allegedly been seen by Mills six years earlier were in Culbertson's possession. *Cf. Farmer*, 370 F.3d at 439 (noting that defendant's "home phone records gave the Customs agents reason to believe that the records [sought by the search warrant] were likely located at [defendant's] residence").

This is especially true given that Mills viewed the alleged photographs on a government laptop computer in a congressional office in Washington, D.C. and *not* at Culbertson's home or on a laptop computer owned by Culbertson. Culbertson specifically told Detective Easley that the laptop computer in question was in the House Office Building and did not belong to him, which information was also known to defendants, but not provided to the magistrate. Even so, the alleged facts provided in Detective Easley's affidavit provided virtually no basis to conclude that it was probable that any video or photographs stored on a government laptop computer located in a congressional office six years ago would have since been moved to Culbertson's home and stored in his home computers for years.[28] Indeed, the only information provided in Detective Easley's affidavit supporting the contention that

---

27. *See also, e.g., United States v. Leasure*, 319 F.3d 1092, 1099 (9th Cir.2003) (finding six months old information not stale, in part because narcotics operation was elaborate and ongoing); *United States v. Spry*, 190 F.3d 829,

836 (7th Cir.1999) (given evidence of "ongoing continuous criminal activity," information that was nine months old was not stale).

28. In this regard, it should be noted that defendants' argument that it was reasonable

Culbertson might still be in possession of the photographs Mills described to him was (i) that Mills had contacted Culbertson about the fact that Nichols' defense attorneys had contacted him and Culbertson told him it was going to be a "tight rope for me to walk," which Mills took to mean Culbertson still had the information; and (ii) Detective Easley's bare conclusion that "a person in possession of items of this magnitude and uniqueness is unlikely to dispose of or destroy the information. Instead, he is more likely to leave it on the computer or copy it to a disc of some sort or both." A magistrate's finding of probable cause, however, cannot be based on "a mere ratification of the bare conclusions of others." Gates, 462 U.S. at 239, 103 S.Ct. 2317. Moreover, Detective Easley's speculative conclusion is based on a false premise. It erroneously assumes that there are only two possibilities—destroy the information or keep it forever. There are of course other options, including the entirely plausible one indicated by the very facts gathered by Detective Easley—that Culbertson turned the information over to a congressional subcommittee before whom

he testified regarding the Oklahoma City bombing.[29] As a result, while it may have been possible or conceivable that Culbertson might still have the video or photographs and that he might have them in his home, there was plainly no "fair probability that contraband or evidence of a crime [would] be found" in his home. Gates, 462 U.S. at 238, 103 S.Ct. 2317 (emphasis added). And, of course, it is clear that mere possibilities and suspicions are insufficient to justify an intrusive search and seizure of a home. See United States v. Condo, 782 F.2d 1502, 1507 (9th Cir.1986) ("Probable cause can be less than prima facie proof, but must be more than a mere suspicion."); United States v. One 1996 Lexus LX450, 1999 WL 617686 at *4 (N.D.Ill. Aug.10, 1999) (information giving rise to probable cause must "lead a reasonable officer to believe that guilt is more than a possibility"). To conclude otherwise in the circumstances at bar impermissibly dilutes to insignificance the probable cause requirement that protects all persons in this country from government searches and seizures in their homes and other private places.[30]

to believe that Culbertson continued to have possession of the alleged video and photographs because he was in possession of these items three years after the Oklahoma City bombing assumes, without any factual basis, that Culbertson had the video and photographs immediately after the 1995 bombing.

29. In addition, it should be noted that there was no probable cause to believe that Culbertson ever possessed a video or still photographs of the Oklahoma City bombing with the Ryder truck in them, as described in Nichols' Emergency Motion. As Detective Easley's own affidavit makes clear, Mills told Detective Easley that he could not remember if he had seen a photograph with the Ryder truck. When told that Nichols' defense counsel claimed in their Emergency Motion that Mills told them he had indeed seen the Ryder truck in the photographs, Mills informed Detective Easley that he had never said that to Nichols' defense team.

30. This discussion underscores why a subpoena duces tecum may have been the appropriate and far less intrusive means by which to ascertain whether Culbertson had possession of the alleged video and still photographs and, if so, to procure their production. Nor would there have been any procedural obstacle to such a course of action; both Virginia and Oklahoma have enacted versions of The Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings. See Va.Code § 19.2–272 et seq.; 22 Okla. St. § 721 et seq. One wonders whether a search warrant would have been sought or issued and executed on such stale and problematic information had this case involved Bob Woodward and the Washington Post, instead of John Culbertson and the Arkansas Chronicle.

In sum, therefore, the undisputed material facts demonstrate a violation of plaintiffs' Fourth Amendment rights in that the search warrant was both overbroad and not supported by probable cause.

Although plaintiffs do not themselves appear to raise this argument in their summary judgment pleadings, it should also be noted that the record reflects that defendants withheld pertinent information from the Virginia magistrate who ultimately issued the search warrant for Culbertson's home. The information withheld—that Culbertson stated the laptop computer was a government computer, that Mills allegedly viewed the photographs in the offices of a former Congressman, and that Culbertson suggested an alternate source of where photographs of the Oklahoma City bombing might be—would have detracted from the Virginia magistrate's probable cause determination. Indeed, while it is clear that defendants may have disbelieved Culbertson, the affidavit given to the Virginia magistrate does not disclose either the facts they chose to disbelieve, the basis for their disbelief, or indeed even their conclusion that Culbertson's statements were unworthy of credence. The misleading nature of the affidavit submitted in support of the search warrant, therefore, could also constitute a Fourth Amendment violation, if the affidavit was deliberately or recklessly misleading. *See Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). On this record, however, it is not clear that detectives Murphy or Milefsky—not themselves signatories to the affidavit written and submitted by Detective Easley—acted deliberately or in reckless disregard for the truth in withholding information from the Virginia magistrate. It is clear, however, that defendants knew about the withheld information. They were given a copy of Nichols' Emergency Motion; they listened to a tape-recording of Detective Easley's telephone conversation with Culbertson; they accompanied Detective Easley and helped him secure a search warrant from a Virginia magistrate and presumably read the affidavit, particularly since it was attached to the search warrant they helped execute on Culbertson's home. Nonetheless, it is not clear on this record that defendants were more than negligent in failing to bring the withheld information to the attention of the Virginia magistrate.

## IV.

This does not end the analysis, however, for defendants argue that even if Fourth Amendment violations occurred, they are entitled to the protection of qualified immunity. The qualified immunity doctrine shields government officials performing discretionary functions from civil damages liability so long as the officials' conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity analysis calls for a two-step inquiry. It is first necessary to determine whether plaintiffs have shown that defendants violated their constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If this first step is satisfied, it then becomes necessary to determine whether the right at issue was clearly established at the time of the violation. *Id.* In determining whether the right at issue was clearly established at the time of the violation, "the right must be defined 'at a high level of particularity.'" *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir.2003) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir.1999)). And, to be clearly established, the law must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creigh-*

*ton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In the context of a search warrant issued by a magistrate, the proper inquiry is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Indeed, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Id.* at 344–45, 106 S.Ct. 1092. This does not mean, however, "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citation omitted).

■■■ In January 2004, it was clearly established that probable cause for a search warrant cannot be based on stale information. *See Sgro v. United States,* 287 U.S. 206, 210, 53 S.Ct. 138, 77 L.Ed. 260 (1932) ("[I]t is manifest that the proof [of probable cause] must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.... That determination, as of that time, cannot be left to mere inference or conjecture."); *Stovall v. Commonwealth,* 213 Va. 67, 189 S.E.2d 353, 356 (1972) (holding that a search warrant "affidavit can be sustained only if the allegations pertaining to [the critical event] were sufficient to show the probability that the ... conduct continued up to the time of the issuance of the search warrant"). Likewise, it was also clearly established in January 2004 that probable cause to believe that evidence of a crime

will be found *at the place to be searched* must exist for a valid search warrant. *See United States v. Dorlouis,* 107 F.3d 248, 255 (4th Cir.1997) ("It has long been established that probable cause exists where the facts and circumstances are sufficient to warrant a person of reasonable caution to believe that a crime has been committed and that seizable property can be found at the place to be searched.") (citing *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). It would have been apparent to a reasonable police officer that no probable cause existed in January 2004 for a search warrant based on an affidavit that relied chiefly on the statement of one individual who claimed to have been shown by Culbertson on one occasion a video and possibly three still photographs of the Murrah building immediately before, at the moment of, and after the bombing on a laptop computer six years earlier in a congressional office in Washington, D.C.[31] The record reflects that Detectives Murphy and Milefsky assisted Detective Easley in obtaining the search warrant by accompanying him to the magistrate judge at the Fairfax County Circuit Court and that they had a copy of Detective Easley's affidavit when they executed the search warrant. In addition, before assisting Detective Easley in procuring the search warrant, Detectives Murphy and Milefsky were shown a copy of the Emergency Motion filed by Nichols' defense counsel and listened to the "pertinent portion" of the tape-recorded phone conversation between Detective Easley and Culbertson. In reviewing all of this information, a reasonable police officer in Detectives Murphy and Milefsky's position would have known that the information

**31.** This is especially true given defendants' knowledge of facts not stated in Detective Easley's affidavit that detract even further from a finding of probable cause. Logic dictates that defendants' knowledge of those omitted facts further diminishes the objective reasonableness of defendants' reliance on the Virginia magistrate's finding of probable cause to search Culbertson's home.

upon which the search warrant was based was stale and that no reasonable officer could have drawn from such information the conclusion that there was a fair probability that evidence of a crime would be found in Culbertson's home in January 2004. *See United States v. Zimmerman,* 277 F.3d 426, 437 (3d Cir.2002) (finding that affidavit in support of warrant so lacked the requisite indicia of probable cause that it was "entirely unreasonable" for officer to believe to the contrary).

Defendants' argument that because an Oklahoma state judge determined that there was probable cause for the search warrant, it was objectively reasonable for defendants to rely on that warrant merits only brief discussion. First, the Oklahoma state court's determination was made *after* the search warrant was issued and executed, therefore it cannot be relied on to justify a search that had already occurred. Moreover, the fact that the Oklahoma state judge also stated at a hearing on January 27, 2004, before the issuance of the warrant, that he thought Nichols' Emergency Motion read "like an affidavit for a search warrant" is also irrelevant as he was not acting as a neutral and detached magistrate. Quite the opposite, the Oklahoma state judge was presiding over a high-profile case and was given the impression by Nichols' defense counsel that Culbertson might be in possession of "monumentally exculpatory" evidence. The Oklahoma state judge perhaps put it best when he stated at the January 27, 2004 hearing: "Who knows if [the tape] does [exist]? But if it does, I want it out." This, essentially, was the motivating force

behind the search warrant for Culbertson's home. As the transcript of the January 27, 2004 hearing in Oklahoma makes abundantly clear, the defense, the prosecution, and the judge in the *Nichols'* case all wanted this evidence to come out, if it indeed existed. And so, at this hearing, before even having read defense counsel's Emergency Motion or spoken with Culbertson, the State of Oklahoma—through prosecutor Elliott—had decided to seek a search warrant for Culbertson's home in search of perhaps phantom evidence by rummaging through all of Culbertson's computer and related equipment to find out if this evidence really existed. As Detective Easley himself stated to Culbertson over the phone, he "came to Washington, D.C. and the State of Virginia with the intent of going to a judge and requesting a search warrant."

As Virginia police officers, Detectives Murphy and Milefsky were perhaps the most detached and removed from the Oklahoma prosecution of Nichols and it should have been apparent to them that the "warrant application was so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley,* 475 U.S. at 344–45, 106 S.Ct. 1092. As a result, they are not entitled to the protection of qualified immunity.[32]

## V.

Accordingly, plaintiffs' motion for summary judgment must be granted in part and denied in part. It must be granted with respect to plaintiffs' Fourth Amendment claim. It must be denied with re-

---

**32.** Defendants should also have known that the search warrant was unconstitutionally overbroad. Defendants had seen a copy of Nichols' Emergency Motion and Detective Easley's affidavit before executing the search warrant. As a result, they knew that the basis underlying the issuance of the search warrant was to search for and seize the alleged video

and still photographs of the Oklahoma City bombing. In reviewing the search warrant, it would have been clear to an objectively reasonable officer in defendants' position that the search warrant was facially overbroad in that it authorized the seizure of many documents and materials that had nothing to do with the Oklahoma City bombing.

spect to plaintiffs' First Amendment claim because plaintiffs effectively abandoned that claim. In addition, defendants' motion for summary judgment must also be granted in part and denied in part. It must be granted with respect to plaintiffs' First Amendment claim for plaintiffs have presented no evidence that Detectives Murphy or Milefsky knew Culbertson was a member of the press, that his home was also an office for a publication, that they intended to halt, disrupt, or delay publication of any kind, or that any publication was in fact halted, disrupted, or delayed. It must be denied with respect to plaintiffs' Fourth Amendment claim.